IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

The Center for Powell Crossing, LLC,

                 Plaintiff,

      v.

The City of Powell, Ohio,

                 Defendant.

Case No: 2:14-cv-2207

Judge Graham

Magistrate Judge Kemp

<u>Opinion and Order</u>

This case presents many complex legal issues relating to the approval by popular vote of an amendment to the Charter of the City of Powell, Ohio in November 2014. The Charter Amendment requires that a commission of five private citizens be organized to draft a new comprehensive zoning and development plan, which at a minimum would prohibit high-density housing in the City's Downtown Business District. The Charter Amendment further provides that the new comprehensive plan will not allow a mixed-use development project proposed by plaintiff The Center for Powell Crossing, LLC. Powell City Council had passed an ordinance approving of Powell Crossing's development plan, which included apartment units, in June 2014.

The matter is before the court on the motion of Powell Crossing for a permanent injunction against the enforcement of the Charter Amendment. Powell Crossing argues that the enactment of the Charter Amendment violates due process, subjects it to unequal protection under the law and violates a provision of the Ohio Constitution confining the use of initiative and referendum powers to legislative, as opposed to administrative, actions.

For the reasons set forth below, the court concludes that Powell Crossing, while not entitled to judgment in its favor as to many of its claims, is entitled to judgment as a matter of law as to one of its due process claims and as to its state constitutional claim. The court thus grants permanent injunctive relief against the enforcement of the Charter Amendment.

I.      **Findings of Fact**

     The facts are not disputed. The verified complaint states that Powell Crossing is a limited liability company organized under the laws of Ohio. It purchased an 8.3 acre tract of land located at

147 West Olentangy Street in Powell, Ohio on January 2, 2013 for $575,000. The land is undeveloped, except for an existing historic structure, and lies within the City's zoned Downtown Business District.

In August 2013, Powell Crossing submitted an initial design plan for mixed-use development of its property to the City of Powell's Planning and Zoning Commission. The proposed development, named the Center at Powell Crossing, included sixty-four units of multi-family dwellings and 14,000 square feet of retail space. After receiving positive feedback from the Commission, Powell Crossing filed an Application for Preliminary Development Plan in October 2013. The Commission unanimously approved the Preliminary Plan Application at its November 13, 2013 public meeting.

On December 31, 2013, Powell Crossing submitted an Application for Final Development Plan with the City. Both the City's Development Staff and the Commission recommended their approval of the Application at the Commission's February 12, 2014 public meeting.

The Final Plan Application was then sent to the Powell City Council. After five public meetings in which the Plan was considered, City Council approved the Application on June 17, 2014 by a vote of 4 to 3. City Council's approval of the Final Plan Application was memorialized in Ordinance 2014-10, with an effective date of July 17, 2014. See Compl., Ex. E.

No administrative appeal of City Council's approval of the Final Plan Application was filed with the Delaware County Court of Common Pleas under Ohio Revised Code § 2506.01.

On July 17, 2014, three residents of Powell – Brian Ebersole, Sharon Valvona and Thomas Happensack (the "Petitioners") – filed three petitions with the Clerk of Powell's City Council. The first was a petition to put Ordinance 2014-10 to a referendum. The second was an initiative petition to pass an ordinance repealing Ordinance 2014-10. The third was an initiative petition to amend the Powell City Charter.

The proposed Charter Amendment concerned two matters: (1) creating a new comprehensive plan for zoning and development in the City and (2) revoking Ordinance 2014-10. As to the first matter, the Charter Amendment required that a commission comprised of five presidents of certain Powell-area homeowners associations be organized to make findings and draft a new Comprehensive Plan. See Charter Am., Art. 4, § 14. The Plan would then be submitted to City Council, which must consider the Plan, "make adjustments" necessary and consistent with the citizen commission's findings and "pass an ordinance no later than March 31, 2016 legislatively

adopting a Final Comprehensive Plan." Id., Art. 4, § 18.  In no event would the Plan allow "high-density housing," which is defined to include multi-family dwellings. Id., Art. 4, § 19.

As to the second matter, the proposed Charter Amendment stated that "Ordinance 2014-10 approving a Final Development Plan for the Center of Powell Crossing LLC" is "not in the best interests of the people of the City of Powell."  Charter Am., Second and Third Whereas Clauses.  It mandated that no action, including construction activity, be taken in reliance upon Ordinance 2014-10 or the Final Development Plan for the Center at Powell Crossing.  Id., Uncodified ¶ 1.  And it further provided that Ordinance 2014-10 would not be permitted under the Final Comprehensive Plan: "The Final Comprehensive Plan legislatively adopted pursuant to Section 18 of this Article IV shall not be compatible with Ordinance 2014-10 and/or the Final Development Plan for the Center at Powell Crossing . . . at 147 W. Olentangy Street."  Id., Art. 4, § 21.  The Amendment thus would prevent Powell Crossing from developing its property in the manner approved by Ordinance 2014-10, both upon the passage of the Amendment and continuing with the enactment of a new comprehensive plan.  The Amendment did provide, however, that Powell Crossing's land would remain viable for "other uses," meaning that Powell Crossing would be able to develop its land for all uses permissible under the zoning code other than high-density housing.  See id., Uncodified ¶ 1.

Powell Crossing filed notices of protest against the three petitions with the Delaware County Board of Elections.  See O.R.C. § 3501.39.  On August 1, 2014, the Board of Elections voted to validate a sufficient number of signatures as to each petition, but opted to defer consideration of the grounds of the protests until they were first presented to City Council.  The Board notified City Council of its action, and on the same day, August 1, Powell Crossing filed notices of protest with City Council.

Upon receiving notice from the Board of Elections, City Council drafted an ordinance, as required by law, to submit the proposed Charter Amendment to the voters on November 4, 2014. See Ohio Const., Art. XVIII, § 8.  The ordinance (Ordinance 2014-41) received its first reading before City Council on August 5, 2014.  At the same meeting, City Council voted to table resolutions regarding the referendum petition and the initiative petition to repeal Ordinance 2014-10 until its next meeting two weeks later.

On August 19, 2014, City Council reviewed all three petitions at a public meeting.  Through its legal counsel, Powell Crossing submitted legal briefing and made a statement in support of its protests at the public meeting.  See Aug. 19, 2014 Meeting Tr. at 11-19.  Upon concluding that the Board of Elections was the appropriate forum to consider Powell Crossing's protests against the

referendum and the initiative to repeal, City Council voted to approve resolutions to forward those measures to the Board. With respect to the Charter Amendment, City Council voted unanimously against submitting it to voters. In connection with their votes against adopting Ordinance 2014-41, several Council members acknowledged their reliance on the City Law Director's opinion that the Charter Amendment was an unconstitutional and standardless delegation of City Council's legislative authority to private citizens under City of Eastlake v. Forest City Enterprises, Inc., 426 U.S. 668 (1976). See Aug. 19, 2014 Meeting Tr. at 78-89.

On August 21, 2014, Powell Crossing again filed notices of protest with the Delaware County Board of Elections against the referendum and the initiative to repeal. After conducting a hearing on August 26, 2014, the Board voted unanimously to accept the protests. The Board determined that Ordinance 2014-10 was an administrative decision which, under Article II, Section 1f of the Ohio Constitution, was not subject to the exercise of referendum or initiative powers. The Board further found that the petitions failed to comply with the City Charter's requirements and the Ohio Secretary of State's required forms for municipal petitions and referenda.

The Petitioners filed a mandamus action against the Board of Elections in the Ohio Supreme Court to require the referendum and initiative to repeal to be placed on the November 2014 ballot. The Ohio Supreme Court denied the writ. Critical to the Ohio Supreme Court's decision was its finding that City Council's approval of the Final Development Plan was an administrative action:

> By its terms, Article II, Section 1f, limits the referendum and initiative power to questions the municipality is "authorized by law to control by legislative action." See Myers v. Schiering, 27 Ohio St.2d 11, 271 N.E.2d 864 (1971), paragraph one of the syllabus. Because citizens of a municipality cannot exercise referendum powers greater than what the Constitution affords, an administrative action is beyond the scope of the referendum power. Buckeye Community [Hope Found. v. City of Cuyahoga Falls, 82 Ohio St.3d 539, 544, 697 N.E.2d 181 (Ohio 1998)].
>
> The test for determining whether an action is legislative or administrative is "whether the action taken is one enacting a law, ordinance, or regulation, or executing a law, ordinance, or regulation already in existence." Donnelly [v. Fairview Park, 13 Ohio St.2d 1, 233 N.E.2d 500 (Ohio 1968)], at paragraph two of the syllabus. Thus, city ordinances that adopt final development plans pursuant to preexisting planned community development, without changing the zoning, are not subject to referendum. State ex rel. Commt. for the Referendum of Ordinance No. 3844–02 v. Norris, 99 Ohio St.3d 336, 2003-Ohio-3887, 792 N.E.2d 186, ¶ 33.
>
> . . .

4

> The development authorized by Ordinance No. 2014–10 complied with the preexisting requirements for the Downtown Business District and for the Downtown District Overlay District and did not require any zoning changes.
>
> . . .
>
> [T]he board is correct that Ordinance No. 2014–10, because it approves development within the contours of a preexisting zoning code, is not subject to referendum or initiative.

State ex rel. Ebersole v. Delaware Cnty. Bd. of Elections ("Ebersole I"), 140 Ohio St.3d 487, 491-93, 20 N.E.3d 678, 684-85 (Ohio 2014) (per curiam).

Petitioners filed a separate mandamus action regarding the proposed Charter Amendment. The Ohio Supreme Court initially denied the writ, holding:

> [T]he proposed charter amendment would be a "standardless delegation of power to a limited group of property owners." Eastlake at 678, 96 S.Ct. 2358. As explained above, under the proposed charter amendment, a commission composed of five private citizens would be responsible for recommending a new comprehensive zoning and development plan to the city council. The city council would then be required to consider the recommendations and adopt a final plan. But the city council's authority in this process would be sharply constrained by the findings of the five private citizens on the commission. Specifically, when adopting a final plan, the city council would be permitted to "make adjustments" to the commission's preliminary plan only to the extent that they are consistent with the commission's findings at Phase I. And the proposed charter amendment does not set forth any standards to govern those findings. In short, the city council would be deprived of final decision-making authority over zoning matters.

State ex rel. Ebersole v. Powell ("Ebersole II"), 141 Ohio St.3d 9, 13-14, 21 N.E.3d 267, 271 (Ohio 2014) (per curiam).

However, on a motion for reconsideration, the Ohio Supreme Court granted the writ of mandamus with respect to placing the Charter Amendment on the ballot. The Court held that City Council did not have authority to assess the constitutionality of the measure. State ex rel. Ebersole v. Powell ("Ebersole III"), 141 Ohio St.3d 17, 19, 21 N.E.3d 274, 276 (Ohio 2014) ("It is not the role of the city council to substitute its judgment for that of the voters as to which matters should appear on the ballot. Nor can the city council assess the constitutionality of a proposal, because that role is reserved for the courts."). The Court further held that the constitutional challenge was not ripe: "The proper time for an aggrieved party to challenge the constitutionality of the charter amendment is after the voters approve the measure, assuming they do so." Id., 141 Ohio St.3d at

20, 21 N.E.3d at 277. Accordingly the Court instructed the City of Powell to take the steps necessary to place the proposed Charter Amendment on the November 2014 ballot.

City Council then approved an Ordinance to place the Charter Amendment on the ballot and filed the measure with the Delaware County Board of Elections on October 8, 2014. On the same day, Powell Crossing filed a notice of protest with the Board. On the next day, Petitioners filed a complaint for a writ of prohibition before the Ohio Supreme Court to prevent the Board from hearing the protest. On October 10, the Supreme Court denied the request for a writ of prohibition and allowed the Board to conduct a hearing on the protest. But the Court granted a writ of mandamus ordering the Board to place the Charter Amendment measure on the ballot regardless of the outcome of the protest hearing.

On October 14, 2014, the Board of Elections passed a resolution finding that Ordinance 2014-10 was an administrative decision not subject to the use of the power to amend the City Charter. See Compl., Ex. L. As it had found with respect to the other two ballot measures, the Board further found that the petition to amend the Charter did not comply with the City Charter's requirements and the Secretary of State's required forms for municipal petitions. But in accord with the Supreme Court's writ, the Board placed the Charter Amendment on the ballot.

The Charter Amendment was approved by the majority vote of Powell citizens on November 4, 2014. At the time the Charter Amendment was enacted, Powell Crossing had not submitted any applications for a construction permit in furtherance of its approved Final Development Plan. See Aff. of David M. Betz, City of Powell Director of Development, ¶ 3.

## II.    Procedural History

The complaint brings suit under 42 U.S.C. § 1983 and asserts several claims under the umbrella of the Due Process Clause of the Constitution: procedural due process, substantive due process, void for vagueness and unlawful delegation of legislative authority. The complaint also alleges that the Charter Amendment violates the constitutional prohibition against bills of attainder and violates the Equal Protection Clause. Further, the complaint asserts that the Charter Amendment violates the provision of the Ohio Constitution concerning which matters may be addressed by way of initiative and referendum. See Ohio Const., Art. II, § 1f. Powell Crossing seeks preliminary and permanent injunctive relief prohibiting the City of Powell from enforcing the Charter Amendment against Powell Crossing, its property or Ordinance 2014-10.

The complaint names the City of Powell as the defendant.  The City has adopted a position agreeing with plaintiff that the Charter Amendment is unlawful – a stance that is consistent with the position the City took in resolving the Notice of Protest in August 2014 and in defending against the Petitioners' mandamus action before the Ohio Supreme Court.  The City nonetheless emphasizes that it has not committed any actions which violate plaintiff's constitutional rights because the Ohio Supreme Court ordered the City to place the Charter Amendment measure on the ballot and because the City has not taken any steps to enforce the Charter Amendment as to Powell Crossing.

This court held several conferences with the parties, and it became clear that the parties do not dispute the facts.  Further, they agree that the legal issues as to whether the Charter Amendment violates plaintiff's constitutional rights are amenable to resolution on the briefs and that plaintiff's request for preliminary injunctive relief should be consolidated under Fed. R. Civ. P. 65(a)(2) with a final resolution on the merits of its request for permanent injunctive relief.  Plaintiff, however, does wish to reserve its demand for damages and attorney's fees for separate resolution.

On December 5, 2014, the court issued a Standstill Order requiring Powell Crossing to abide by the Charter Amendment and prohibiting the City from taking any action to implement the Charter Amendment as it pertains to Powell Crossing's development plan.  On January 26, 2015, the court granted leave to the Petitioners to file an *amicus curiae* brief opposing Powell Crossing's motion for preliminary and permanent injunctive relief.  In that same order, the court instructed the parties to submit further briefing concerning the issue of whether plaintiff's claims in essence amounted to a takings claim not ripe for review in federal court.  Those briefs have been submitted and the matter is now ready for resolution.

On June 2, 2015, the National Association of Home Builders filed a motion for leave to file an *amicus curiae* brief in support of plaintiff's motion for injunctive relief.  The City has filed a notice that it does not oppose the motion for leave but believes that the proposed *amicus* brief does not substantially add to the court's consideration of the issues.  The court hereby grants the Association's motion for leave but largely agrees with the City's evaluation of the *amicus* brief.

### III.    Standard of Review

Preliminary injunctions are available under Rule 65(a) of the Federal Rules of Civil Procedure.  They are extraordinary remedies that are governed by the following considerations: "(1) whether the movant has a strong likelihood of success on the merits, (2) whether the movant would suffer irreparable injury absent a stay, (3) whether granting the stay would cause substantial harm to

others, and (4) whether the public interest would be served by granting the stay." <u>Ohio Republican Party v. Brunner</u>, 543 F.3d 357, 361 (6th Cir. 2008).

Under Rule 65(a)(2), the court may in appropriate circumstances consolidate the request for a preliminary injunction with a final hearing on the merits of the issues raised by the motion for injunctive relief. <u>See</u> <u>Barden Detroit Casino, L.L.C. v. City of Detroit</u>, 230 F.3d 848, 853 (6th Cir. 2000). Here, there is no evidence to present to the court beyond what was submitted with the verified complaint and the briefing, and the parties and Petitioners have presented their legal arguments in their briefs. <u>See</u> <u>Univ. of Texas v. Camenisch</u>, 451 U.S. 390, 395-96 (1981) (stating that a district court, when invoking Rule 65(a)(2), must provide the parties with a full opportunity to present their cases); <u>Wedgewood Ltd. P'ship I v. Twp. of Liberty, Ohio</u>, 610 F.3d 340, 349 (6th Cir. 2010) (noting that while a district court should ordinarily conduct an evidentiary hearing prior to granting a permanent injunction, it need not do so if "no factual issues remained for trial"). Under Rule 52, a district court must find facts and state its conclusion of law in actions tried without a jury. Fed. R. Civ. P. 52(a)(1). The following sections of this opinion and order represent the court's conclusions of law.

## IV. Powell Crossing's Claims Do Not Amount to an Unripe Takings Claim

Though the complaint does not allege a violation of the Takings Clause of the Fifth Amendment, Petitioners raise a significant threshold issue in their *amicus* brief. Petitioners argue that this court does not have jurisdiction over plaintiff's claims because they amount to a disguised and unripe takings claim.

Under the Fifth Amendment, private property shall not "be taken for public use, without just compensation." U.S. Const. amend. V; <u>see</u> <u>Chicago Burlington & Quincy R.R. Co. v. Chicago</u>, 166 U.S. 226, 239 (1897) (holding that the Takings Clause applies to the states). Courts recognize two types of takings: *per se*, or physical, takings and regulatory takings. <u>McCarthy v. City of Cleveland</u>, 626 F.3d 280, 284 (6th Cir. 2010). A physical taking occurs when "the government physically intrudes upon a plaintiff's property." <u>Waste Mgmt., Inc. of Tenn. v. Metro. Gov't of Nashville and Davidson Cnty</u>, 130 F.3d 731, 737 (6th Cir. 1997). A regulatory taking occurs when a governmental regulation leaves a property owner with either "*no* productive or economically beneficial use" of his property, <u>Lucas v. South Carolina Coastal Council</u>, 505 U.S. 1003, 1017 (1992) (emphasis in original), or prevents a property owner from enjoying "some – but not all – economic uses." <u>Harris v. City of St. Clairsville</u>, 330 Fed. App'x 68, 76 (6th Cir. 2008). A takings claim of

either type is not ripe for federal court review until a property owner is denied just compensation. Williamson Cnty. Reg'l Planning Comm'n v. Hamilton Bank, 473 U.S. 172, 194 (1985).

Petitioners rely on Braun v. Ann Arbor Charter Twp., 519 F.3d 564 (6th Cir. 2008), in arguing that the court cannot exercise jurisdiction over Powell Crossing's claims. The Sixth Circuit held in Braun that "[w]here a procedural due process claim occurs alongside a takings claim, we have focused on the circumstances of the specific case – and particularly the issue of when the alleged injuries occurred – before deciding whether to apply" Williamson County's exhaustion requirement for a takings claim. 519 F.3d at 572 (6th Cir. 2008) (citing cases). Because "the thrust of the plaintiffs' due process claim [was] that the Township's refusal to rezone their property was a taking," the court found that the due process claim was ancillary to the takings claim and that the exhaustion requirement applied. Id. ("[I]f the plaintiffs were to succeed in their state-court takings claim, no procedural due process injury would likely exist.).

The court finds that Braun is distinguishable for two reasons. First, Powell Crossing has not asserted a takings claim alongside its due process claims. See Coniston Corp. v. Vill. of Hoffman Estates, 844 F.2d 461, 463-64 (7th Cir. 1988) (recognizing the viability of procedural and due process claims regarding a zoning action, where plaintiff opted not to assert a takings claim: "they do not want compensation; they want their site plan approved"). The complaint is devoid of takings-type allegations. Even so, Petitioners argue that Powell Crossing has asserted a takings claim by alleging the amount of the purchase price of the land in the complaint. Petitioners construe this allegation as signaling Powell Crossing's intent to seek the value of its land as compensatory damages. Petitioners argue that Powell Crossing could seek compensation through state court proceedings for any loss in the value of its land. See Shelly Materials, Inc. v. Bd. of Zoning Appeals, 160 Fed. App'x 443, 446 (6th Cir. 2005) ("Ohio provides a procedure for obtaining just compensation for a governmental taking. A property owner may bring an action in mandamus, under Chapter 2731 of the Ohio Revised Code, to force government officials to commence eminent domain proceedings."). The court disagrees with Petitioners' interpretation of the complaint. The allegation of the purchase price of the land appears in the factual narrative section of the complaint, see Compl., ¶ 21, and is not repeated in the counts for relief or the prayer for relief.

Second, the thrust of Powell Crossing's claims is not that the Charter Amendment was a taking. A review of the Sixth Circuit's identification of the "kinds of federal zoning cases" provides guidance:

1. *Just compensation takings claim.* Plaintiff claims that the zoning applied to his land constitutes a taking of his property without just compensation in contravention of the Fifth Amendment, the remedy sought being the just compensation.

2. *Due process takings claim.* Plaintiff claims that the zoning applied to his property goes too far and destroys the value of his property to such an extent that it amounts to a taking by eminent domain without due process of law. The remedy sought is invalidation of the zoning regulation.

3. *Arbitrary and capricious substantive due process claim.* Plaintiff claims that the zoning regulation is arbitrary and capricious in that it does not bear a substantial relation to the public health, safety, morals, or general welfare. Two further subcategories may be discerned under this heading: (a) facial and (b) as applied.

4. *Equal protection.* Either based on suspect class, invoking strict scrutiny, or mere economic discrimination.

5. *Procedural due process.* Although not discussed by the Eleventh Circuit, there is, of course, a fifth category where plaintiff claims deprivation of procedural due process.

6. *First Amendment.* A category may also be defined when plaintiff claims that a First Amendment right such as freedom of speech or religion is violated by the zoning ordinance.

Pearson v. City of Grand Blanc, 961 F.2d 1211, 1215-16 (6th Cir. 1992) (footnotes omitted) (citing Eide v. Sarasota Cnty., 908 F.2d 716, 720–22 (11th Cir. 1990), *cert. denied*, 498 U.S. 1120 (1991)).

Powell Crossing's procedural due process claim does not rest on allegations of "diminution in the value" of the land, nor does it seek compensation for a taking. Cf. J-II Enterprises, LLC v. Bd. of Comm'rs of Warren Cnty., Ohio, 135 Fed. App'x 804, 806 (6th Cir. 2005) (construing a purported procedural due process claim as a takings claim where "the injury of which Plaintiffs complain and the relief they seek concern rights guaranteed by the Takings Clause and the Just Compensation Clause of the Fifth Amendment"). Rather, the thrust of the procedural due process claim is that there were infirmities in the process – that the Final Development Plan approved by City Council was then subjected to review and rejected by voters who lacked authority under state law to review the plan and that Powell Crossing did not have an adequate opportunity to be heard. See Hammond v. Baldwin, 866 F.2d 172, 176 (6th Cir. 1989) ("[I]f the [claimed] injury is the infirmity of the process, neither a final judgment nor exhaustion [of administrative remedies] is required."). Such a procedural due process claim is "instantly cognizable in federal court" at the time of the alleged procedural defect. Nasierowski Bros. Inv. Co. v. City of Sterling Heights, 949 F.2d 890, 894 (6th Cir. 1991) ("[I]n the case of a procedural due process claim, the allegedly infirm

process is an injury in itself, . . .  whereas, in the context of a takings claim, the alleged injury – a diminution in property value – cannot be assessed with any degree of certainty until the municipality arrives at a final decision as to how the property owner will be permitted to develop his property.") (internal quotation marks and citation omitted); see also Braun, 519 F.3d at 572 ("The injury in Nasierowski was complete the instant he did not receive notice or a hearing.  Thus, the plaintiff in Nasierowski was seeking the very opportunity to have a hearing . . . and not a declaration that the state action constituted a taking.").

Further, the thrust of the substantive due process and equal protection claims is that the Charter Amendment targeted or singled out Powell Crossing.  These claims rest on allegations of arbitrary and unfair treatment and not upon an alleged taking.  See Lingle v. Chevron U.S.A., Inc., 544 U.S. 528, 542-43 (2005) ("Due process violations cannot be remedied under the Takings Clause, because if a government action is to be found impermissible – for instance because it fails to meet the public use requirement or is so arbitrary as to violate due process – that is the end of the inquiry. No amount of compensation can authorize such action.") (internal quotation marks and citations omitted); Action Apartment Ass'n, Inc. v. Santa Monica Rent Control Bd., 509 F.3d 1020, 1025 (9th Cir. 2007) ("After Lingle, the Fifth Amendment does not invariably preempt a claim that land use action lacks any substantial relation to the public health, safety, or general welfare . . . . We see no difficulty in recognizing the alleged deprivation of rights in real property as a proper subject of substantive due process analysis.") (internal quotation marks and citations omitted); Pearson, 961 F.2d at 1214-15 (holding that "the very existence of an allegedly unlawful zoning action, without more, makes a substantive due process claim ripe for federal adjudication"); Gypsum Res., LLC v. Masto, 672 F.Supp.2d 1127, 1145 (D. Nev. 2009) (same).

Finally, the court rejects Petitioners' assertion that Powell Crossing's claims are so meritless as to represent an attempt to disguise the claims and circumvent the exhaustion requirement for a takings claim.  See Choate's Air Conditioning & Heating, Inc. v. Light, Gas, Water Div., 16 Fed. App'x 323, 330 (6th Cir. 2001) (rejecting due process claim where plaintiff "merely repackaged a takings claim as a substantive due process violation for purposes of filing a § 1983 action in federal court" and "failed to set forth any constitutional basis for the asserted substantive due process violation"); Williamson v. Scioto Twp., No. 2:13-cv-683, 2014 WL 4388266 at *9 (S.D. Ohio Sept. 5, 2014) (holding that "unclear and underdeveloped" due process claim could not be used to "bypass" the ripeness requirement for a takings claim); Stainislaw v. Thetford Twp., No. 09-10256, 2011 WL 3516064, at *1 (E.D. Mich. Aug. 11, 2011) (holding that allegations of a wrongful taking without

compensation could not be re-characterized as a due process claim in an effort to avoid the ripeness requirement). The court finds that the complaint sets forth the grounds for cognizable due process and equal protection claims and that courts, when reviewing allegations similar to those made by Powell Crossing, have analyzed them as due process and equal protection claims, rather than takings claims. See, e.g., City of Cuyahoga Falls v. Buckeye Cmty. Hope Found., 538 U.S. 188 (2003) (substantive due process and equal protection challenges by developer to having its site plan subjected to a referendum); Wedgewood, 610 F.3d 340 (procedural due process challenge by landowner to a change in zoning law that impaired its ability to develop the property); 37712, Inc. v. Ohio Dep't of Liquor Control, 113 F.3d 614 (6th Cir. 1997) (procedural due process, substantive due process and equal protection challenges by owner of liquor permit to a local option referendum); Club Misty, Inc. v. Laski, 208 F.3d 615 (7th Cir. 2000) (procedural due process challenge by owner of liquor license to a local option election).

## V.     Due Process Claims

### A.     Procedural Due Process

States may not "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. Procedural due process "is traditionally viewed as the requirement that the government provide a 'fair procedure' when depriving someone of life, liberty, or property." EJS Props., LLC v. City of Toledo, 698 F.3d 845, 855 (6th Cir. 2012) (quoting Collins v. City of Harker Heights, 503 U.S. 115, 125 (1992)). When a property or liberty interest is at stake, "procedural due process generally requires that the state provide a person with notice and an opportunity to be heard" before the deprivation occurs. Warren v. City of Athens, 411 F.3d 697, 708 (6th Cir. 2005).

In order to establish a procedural due process claim, plaintiff must show that "(1) it had a life, liberty, or property interest protected by the Due Process Clause; (2) it was deprived of this protected interest; and (3) the state did not afford it adequate procedural rights." Daily Services, LLC v. Valentino, 756 F.3d 893, 904 (6th Cir. 2014).

#### 1.     Protected Property Interest

Property interests "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law – rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." Bd. of Regents of State Colls. v. Roth, 408 U.S. 564, 577 (1972). To determine whether Powell Crossing

has a protected property interest, the court looks to substantive state zoning laws.  Wedgewood, 610 F.3d at 352.  "[A] party obtains a protected property right under the Fourteenth Amendment when it can demonstrate a 'legitimate claim of entitlement' or a 'justifiable expectation' in the approval of his [building] plan.'"  Id. (quoting Silver v. Franklin Twp. Bd. of Zoning Appeals, 966 F.2d 1031, 1036 (6th Cir. 1992)).  In order to establish an expectation or claim of entitlement, a plaintiff must prove that the state or local governmental actor lacked the discretion to deny the proposed land use, so long as plaintiff complied with all applicable zoning requirements.  See Silver, 966 F.2d at 1036; Richardson v. Twp. of Brady, 218 F.3d 508, 507 (6th Cir. 2000) (stating that there can be "no legitimate claim of entitlement to a discretionary decision").

Powell Crossing argues that its property interest in the mixed-use development plan vested in October 2013 when it filed an application for approval of its preliminary plan of development. Powell Crossing cites case law stating that "a landowner's right to an existing zoning classification vests upon his submission of an application for a building or zoning certificate."  Wedgewood, 610 F.3d at 352 (citing Gibson v. Oberlin, 171 Ohio St. 1, 5, 167 N.E.2d 651, 654 (Ohio 1960)).  Vesting occurs if the property owner complies "'with all the legislative requirements for the procurement of a building permit and his proposed structure falls within the use classification of the area in which he proposes to build it.'"  Id. (quoting Zaremba Dev. Co. v. City of Fairview Park, 84 Ohio App.3d 174, 176, 616 N.E.2d 569, 571 (Ohio Ct. App. 1992)).  Where the landowner has complied with existing law, he has a right to a permit, see id., and, under Ohio law,  subsequent changes in the law "'cannot deprive him of the right,'"  Zaremba, 84 Ohio App.3d at 176, 616 N.E.2d at 571 (quoting Gibson, 171 Ohio St. at 5-6, 167 N.E.2d at 654).

The court agrees that Powell Crossing has a protected property interest in its mixed-use development plan but finds that the interest vested later than at the preliminary application stage. The case law cited by Powell Crossing concerns situations in which the government actor lacked discretion under Ohio law to deny a benefit.  See Zaremba, 84 Ohio App.3d at 176, 616 N.E.2d at 571 (city was "duty bound" to issue a building permit).  However, "a party cannot possess a property interest in the receipt of a benefit when the state's decision to award or withhold the benefit is wholly discretionary."  Med Corp., Inc. v. City of Lima, 296 F.3d 404, 409 (6th Cir. 2002). If, as will be shown the case here, the government actor has the discretion to deny a benefit, then the developer does not have a "legitimate claim of entitlement" or a "justifiable expectation" in the approval of its development plan application.  Silver, 966 F.2d at 1036.

"In Ohio, 'the right to approval of a land-use proposal is determined by the regulation in existence at the time the application is filed.'" Ziss Bros. Const. Co., Inc. v. City of Independence, Ohio, 439 Fed. App'x 467, 472 (6th Cir. 2011) (quoting Andreano v. City of Westlake, 136 Fed. App'x 865, 871 (6th Cir. 2005)). The City of Powell's Municipal Code creates a Downtown Business District, in which Powell Crossing's property is located. See City of Powell Code § 1143.16.2. The Code specifies the uses, structures, facilities and activities permitted in the Business District. Id. Among the approved uses are retail shops, offices, single-family dwellings and multi-family dwellings. Id., § 1143.16.2(b). Plans for development within the Business District must undergo a three-step review process. The developer must first attend a pre-application meeting with the City Manager, the Zoning Administrator and the Planning and Zoning Commission. Id., § 1143.11(a). The pre-application meeting is "informal" and "no statements" made by City officials are binding. Id.

Following the pre-application meeting, the developer may then submit an application for approval of a Preliminary Planned District Development Plan. The Commission conducts a public hearing on the preliminary application and votes on whether to approve it. See City of Powell Code § 1143.11(b)-(g). If the application satisfies the requirements detailed in § 1143.11(c) and is "consistent" with the considerations set out in § 1143.11(g), then "the Commission *shall* approve the preliminary development plan in principle." Id., § 1143.11.(g) (emphasis added).

Though § 1143.11 expressly limits the ability of the Planning and Zoning Commission to reject an application for the approval of a preliminary development plan, it does not contain language so limiting the discretion of City Council. If the developer receives approval of the preliminary plan application, it then may submit a final plan application that is subject to certification by the Zoning Administrator, a public hearing and recommendation by the Commission, and a public hearing and vote by City Council. Id., § 1143.11(h)-(n). City Council "shall *either* adopt or deny the recommendation of the Planning and Zoning Commission or adopt some modification thereof." Id., § 1143.11(n) (emphasis added). The Code does not require City Council to approve a plan even if the Commission was required to recommend its approval. Thus, the Code gives City Council broad discretion to approve, reject or modify the Commission's recommendation, and the act of filing a preliminary development plan application does not create an entitlement to final approval by City Council.[1] See EJS Props., 698 F.3d at 856 (holding that the developer did not have

---

[1] Powell Crossing points to statements made by two City Council members to the effect that they view their roles as simply checking whether the developer's application and proposed use complies

a protected property interest in a rezoning petition, which had been approved by the city's zoning and planning committee, because city council retained full discretion to approve, deny or amend the petition); Silver, 966 F.2d at 1036 (holding that a property owner did not have entitlement to a zoning certificate, even when the proposed use was conditionally permitted, because the zoning board had "broad discretion" to decline to issue the certificate). See also J.D. P'ship v. Berlin Twp. Bd. of Trustees, 412 F.Supp.2d 772, 780 (S.D. Ohio 2005) (holding that developer did not have a protected property interest in approval of housing development application because the township's zoning resolution did not require the board of trustees to approve the application); White Oak Prop. Dev., LLC v. Washington Twp., Ohio, No 1:07-cv-595, 2009 WL 961175 at *13 (S.D. Ohio Apr. 7, 2009) (holding that developer did not have a property interest in a development plan because the board of trustees could "either adopt or deny, or adopt some modification" of the zoning commission's recommendation), aff'd, 606 F.3d 842, 853 (6th Cir. 2010); State ex rel. Harpley Builders, Inc. v. Akron, 62 Ohio St.3d 533, 536, 584 N.E.2d 724, 726 (Ohio 1992) (holding that a municipality has the inherent authority to rescind its preliminary approval of a proposed housing development plan); Grove v. Oxford City Council, No. CA2010-04-076, 2011 WL 193338 at **2-3 (Ohio Ct. App. Jan. 10, 2011) (holding that city's preliminary approval of development plan was "just that, preliminary," and "did not fix any duties, privileges, benefits or establish any legal relationships with finality") (internal quotation marks omitted).

The court nonetheless finds that Powell Crossing did obtain a protected property interest in its development plan when City Council approved the plan. Property owners "have an interest in a discretionary benefit, such as a re-zoning ordinance, after it is conferred." EJS Props., 698 F.3d at 856. The Sixth Circuit's holding in Buckeye Cmty. Hope Found. v. City of Cuyahoga Falls, is on point:

---

with the zoning laws. See Compl., Ex. D at 13-14 (minutes from the June 17, 2014 public meeting in which City Council approved Powell Crossing's final plan application). If so, then they believe that they must vote to approve the application. See id.

The Code, which lists numerous factors that should be considered during the application process, does naturally provide Council members with guidance as they determine whether to adopt, deny or modify a recommendation from the Commission. And it may be that at least two Council members approached the Code as setting forth criteria that, if satisfied, mandated their vote of approval. However, the language of the Code does not require City Council to approve a final plan application even if the various factors are satisfied. Cf. EJS Props., 698 F.3d at 857 (rejecting theory "that in practice, the Toledo City Council's approval of an ordinance was 'pro forma' such that EJS had a legitimate expectation of receiving approval"; "[t]he law is clear that a party cannot have a property interest in a discretionary benefit, even if that discretion had never been exercised previously").

> [T]he alleged property interest at stake in both <u>Silver</u> and <u>Triomphe [Investors v. City of Northwood</u>, 49 F.3d 198 (6th Cir. 1995)] arose from the failure of the decision-making bodies to approve plaintiffs' proposed use for their respective properties. However, in the case at bar, the City Council actually approved plaintiffs' site plan after having concluded that the site plan conformed with the existing zoning regulations. Thus, the property interest at stake in this case arose from the City Council's approval of plaintiffs' site plan . . . .

263 F.3d 627, 642 (6th Cir. 2001), *rev'd on other grounds*, 538 U.S. 188 (2003). Here, once City Council approved the final plan application, the City did not have discretion to rescind the benefit and its decision was subject only to judicial review under Ohio Revised Code § 2506.01. See <u>Med Corp.</u>, 296 F.3d at 409 (holding that in order to establish a constitutionally-protected property interest, plaintiff "must point to some policy, law, or mutually explicit understanding that both confers the benefits and limits the discretion of the City to rescind the benefit"); <u>Chandler v. Vill. of Chagrin Falls</u>, 296 Fed. App'x 463, 470 (holding that landowner "had a protected property interest in the building permit once it was issued"); <u>Hillside Prods., Inc. v. Duchane</u>, 249 F.Supp.2d 880, 893 (E.D. Mich. 2003) ("Entitlements to permits are rare. In this case, however, Defendants had already exercised their discretion to grant a Special Approval Land Use . . . .").

Petitioners argue that despite City Council's approval of the Final Development Plan, Powell Crossing does not have a protected property interest because the preliminary plan application failed in the first instance to comply with the Code's proof-of-financing requirement. The Code requires a developer to submit evidence with its preliminary plan application "that the applicant has sufficient control over the land and financing to initiate the proposed development plan phase within two (2) years." City of Powell Code § 1143.11(c)(9). It is undisputed that Powell Crossing was not required to submit traditional proof-of-financing documentation because the City's Director of Development "was familiar with Powell Crossing through prior development projects and so considered it responsible." <u>Ebersole I</u>, 140 Ohio St.3d at 492, 20 N.E.3d at 684.

Petitioners argue that the City should not have waived strict compliance with the proof-of-financing requirement. This argument, which raises the issue of whether the Director's familiarity with the developer's financial wherewithal counted as evidence of the applicant having sufficient financing, could have been raised through an administrative appeal of Ordinance 2014-10 under Ohio Revised Code § 2506.01. The Ohio Supreme Court found that the very argument Petitioners are now making concerned "an error that the administrative appeal process in R.C. Chapter 2506 exists to correct." See <u>Ebersole I</u>, 140 Ohio St.3d at 492, 20 N.E.3d at 684-85. Their argument is of no avail here because the City in fact gave its approval to the development plan; that is, the City

conferred the benefit and Powell Crossing's property interest vested.  See Chandler, 296 Fed. App'x at 470 n.4 (rejecting as "wholly without merit" the theory that a property owner did not have a protected property interest in an already-issued building permit because state appellate procedures were available to review the permit decision: "Were this Court to adopt such a rule, a whole class of regulated benefits, licenses and permits would be excluded from the protection of the Due Process Clause"); Stile v. Copley Twp., Ohio, 115 F.Supp.2d 854, 865 n.21 (N.D. Ohio 2000) (rejecting as a "red herring" the argument that plaintiff's property interest in a zoning certificate, which the court found had vested, was not protectable because of prior noncompliance with the application requirements).

### 2.        Deprivation without Adequate Procedural Rights

Having established a protected property interest in its development plan, Powell Crossing must next establish that it was deprived of its property interest and that the state failed to afford it adequate procedural rights.  Daily Services, 756 F.3d at 904.

There is no dispute that Powell Crossing has suffered a deprivation of its property interest in the Final Development Plan.  The Charter Amendment expressly forbids Powell Crossing from taking any action, including construction activity, in furtherance of the Final Development Plan or Ordinance 2014-10.  And this deprivation is permanent, as the Charter Amendment further provides that at a minimum the high-density housing component of Powell Crossing's plan will not be permitted under the forthcoming Final Comprehensive Plan.  Thus, the Charter Amendment deprives Powell Crossing of its ability to use the land in the manner approved by City Council in Ordinance 2014-10.

The question of what process Powell Crossing was due is the difficult issue here.  The Sixth Circuit has directed courts to determine whether the deprivation is a result of "an established procedure" or is "pursuant to a random and unauthorized act" of a state employee.  Daily Services, 756 F.3d at 907; Wedgewood, 610 F.3d at 349-50.  "If the former, then it is both practicable and feasible for the state to provide pre-deprivation process, and the state must do so regardless of the adequacy of any post-deprivation remedy. . . . If the latter, then predeprivation procedures are simply impracticable and an adequate post-deprivation remedy affords all the process that is due." Walsh v. Cuyahoga Cnty, 424 F.3d 510, 513 (6th Cir. 2005) (internal quotation marks and citations omitted).

17

### a.    Random and Unauthorized Act

Powell Crossing asserts that the deprivation it suffered came by means of a random and unauthorized act.  Powell Crossing focuses on the latter part of that phrase,[2] viewing the Charter Amendment as "unauthorized" in the sense that the Ohio Constitution allows only legislative decisions, and not administrative decisions, to be subjected to the exercise of initiative and referendum powers.  See Ohio Const., Art. II, § 1f ("The initiative and referendum powers are hereby reserved to the people of each municipality on all questions which such municipalities may now or hereafter be authorized by law to control by legislative action[.]").  Powell Crossing points to the Ohio Supreme Court's conclusion that City Council's approval of the development plan was administrative in nature.  Ebersole I, 140 Ohio St.3d at 491-92, 20 N.E.3d at 684 ("[C]ity ordinances that adopt final development plans pursuant to preexisting planned community development, without changing the zoning, are not subject to referendum."); see also Buckeye Cmty. Hope Found. v. City of Cuyahoga Falls, 82 Ohio St.3d 539, 697 N.E.2d 181 (Ohio 1998).

The court, for reasons explained in Section IX below, agrees that certain provisions of the Charter Amendment were the functional equivalent of a referendum on Ordinance 2014-10 and beyond the scope of the powers reserved to the people by the Ohio Constitution.[3]  Cf. Ebersole I, 140 Ohio St.3d at 487, 20 N.E.3d at 680 (stating that the Charter Amendment "would among other things, nullify Ordinance No. 2014-10"); State ex rel. Comm. for the Referendum of Ordinance No. 3844–02 v. Norris, 99 Ohio St.3d 336, 342, 792 N.E.2d 186, 191-92 (Ohio 2003) (per curiam) (holding that an ordinance adopting a final development plan was an administrative action not subject to referendum).

However, the court finds that the "random and unauthorized act" mode of due process analysis is not applicable here.  The word "random" (in contrast to the word "established" in the other mode of analysis) provides a critical clue that this area of due process jurisprudence addresses unanticipated deprivations for which the state cannot be reasonably expected to provide

---

[2]    In asserting its random and unauthorized act theory, Powell Crossing cites a case, Brookpark Entertainment, Inc. v. Taft, 951 F.2d 710 (6th Cir. 1991), for the proposition that the voter's approval of the Charter Amendment was arbitrary and capricious.  See Doc. 19 at 15.  Powell Crossing seems to suggest that "arbitrary" equates to "random."  See id. at 16.  However, courts do not use those terms synonymously in due process analysis, as the phrase "arbitrary and capricious" is employed in substantive due process analysis.  See Range v. Douglas, 763 F.3d 573, 588 (6th Cir. 2014).

[3]    Petitioners readily admit that "the practical effect of the charter amendment [was] to nullify the Powell Crossing project."  Doc. 28 at 5 n.5.

predeprivation process.  See Hudson v. Palmer, 468 U.S. 517, 531-33 (1984).  While due process generally requires predeprivation notice and an opportunity to be heard, Warren, 411 F.3d at 708, postdeprivation process is all that is required when there is "either the necessity of quick action by the State or the impracticality of providing any meaningful predeprivation process, when coupled with the availability of some meaningful means by which to assess the propriety of the State's action at some time after the initial taking."  Parratt v. Taylor, 451 U.S. 527, 539 (1981).  "The underlying rationale of Parratt is that when deprivations of property are effected through random and unauthorized conduct of a state employee, predeprivation procedures are simply 'impracticable' since the state cannot know when such deprivations will occur."  Hudson, 468 U.S. at 533.  In such circumstances, "meaningful postdeprivation remedy for the loss" is the process due.  Id.

The placement of the Charter Amendment on the ballot and its passage by voters were not "random" in the sense meant by the case law.  This is not a situation in which a state employee lost or destroyed property, as in Parratt and Hudson, or engaged in some other unforeseeable act.  See Walsh, 424 F.3d at 513-14; DiLuzio v. Vill. of Yorkville, Ohio, No. 14–3970, 2015 WL 4646121 at *2 (6th Cir. Aug. 6, 2015) (holding that the official's action must be "unpredictable"); Williamson v. Scioto Twp., No. 2:13-cv-683, 2014 WL 4388266 at *10 (S.D. Ohio Sept. 5, 2014) (township employee improperly installed a culvert).  Indeed, there is no action of a state employee in question here at all.  Rather, Petitioners used established state procedures, including collecting signed petitions from 10% of the electors, to put the Charter Amendment on the ballot.  See Ohio Const., Art. XVIII, § 9 (outlining the procedure by which proposed amendments to a city charter can be placed on the ballot); Powell City Charter, Art. XII, § 12.01 (same).  Voters then approved the measure and the City was required under state law to treat the enacted Charter Amendment as valid law.  See Ohio Const., Art. XVIII, § 9.  Powell Crossing itself concedes that the City was not "blind-sided" by the citizens' use of the power to amend the Charter."  Doc. 19 at 3.

A review of the Supreme Court's decision in Zinermon v. Burch, 494 U.S. 113 (1990), limiting the reach of Parratt and Hudson, further highlights why the "random and unauthorized act" mode of analysis does not apply here.  In Zinermon, staff at a state mental hospital admitted the plaintiff under a voluntary placement procedure even though plaintiff was not competent to give informed consent, as required by statute.  The Court held that Parratt and Hudson were inapplicable for several reasons, including two worth noting here.  First, the deprivation would have had to occur "at a specific, predictable point," which was the point of admission to the hospital.  Id. at 136 (explaining that it was foreseeable that "a person requesting treatment for mental illness might be

incapable of informed consent" and that any "erroneous deprivation will occur, if at all, at a specific, predictable point in the admission process – when a patient is given admission forms to sign). Second, the state could have provided predeprivation process because state law had an established procedure for involuntary placement.  Id. at 136-37.

In this case, the allegedly erroneous deprivation had to occur, if at all, at a specific, predictable point in time – on election day, when voters would decide whether to approve the Charter Amendment and thereby nullify Ordinance 2014-10.  Further, the state had in place predeprivation process for Powell Crossing.  See Hudson, 468 U.S. at 534 (stating that the "controlling inquiry" in determining the applicability of Parratt "is solely whether the state is in a position to provide for predeprivation process").  Under Ohio Revised Code § 3501.39, Powell Crossing could, and did, file a notice of protest with the County Board of Election, and a mandamus action or action for writ of prohibition was available in state court under Ohio Revised Code § 2731.02.  See Lane v. City of Pickerington, 588 Fed. App'x 456, 466 (6th Cir. 2014) ("We conclude . . . that Parratt has no application here because Lane was not deprived of his constitutionally protected property interest due to a random or unauthorized act; Defendants had the opportunity to provide Lane pre-deprivation process pursuant to an established procedure – and indeed did provide a pre-termination hearing, albeit a constitutionally inadequate one.").

Thus, the court finds that the deprivation of Powell Crossing's property interest in the Final Development Plan did not occur by means of a random and unauthorized act of the state.

## b.    Established State Procedure

The essence of how Powell Crossing alleges it was deprived of its property interest is this – voters enacted a Charter Amendment containing provisions which exceeded the scope of their authority to act by ballot measure under the Ohio Constitution.  The deprivation, as noted above, was accomplished by means of established state procedure.  See Ohio Const., Art. XVIII, § 9.  As such, the basic requirement of the Due Process Clause is that Powell Crossing had notice and an opportunity to be heard before it was deprived of its property interest.  See Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 542 (1985).  See also Nasierowski, 949 F.2d at 896 (holding that where a proposed zoning amendment has an impact on a "specifiable individual," the individual is entitled to predeprivation notice and a hearing); Wedgewood, 610 F.3d at 354-55 (same).

Powell Crossing characterizes the Charter Amendment as an unauthorized, *ultra vires* act. However, a violation of state law does not "automatically translate into a deprivation of procedural due process under the United States Constitution."  DePiero v. City of Macedonia, 180 F.3d 770,

788 (6th Cir. 1999). "The question thus is not whether [the state] acted *ultra vires*; it is whether the process followed . . . meets due process." Jaber v. Wayne State Univ. Bd. of Governors, 487 Fed. App'x 995, 998 (6th Cir. 2012) (rejecting due process claim where plaintiff alleged "that only the Board, not the Dean, has the authority under Michigan law to revoke degrees, making the Dean's decision a due process violation").

The court's finding that the deprivation came by means of an established state procedure compels the conclusion that Powell Crossing was due more process (predeprivation notice and opportunity to be heard) than what it has alleged it was due (a postdeprivation hearing under Parratt and Hudson). Nonetheless, Powell Crossing's briefs set forth the reason why it believes that the process it did receive was inadequate. See Doc. 2 at 31; Doc. 19 at 14-15; Doc. 27 at 14 n.3.

There is no dispute that Powell Crossing received notice of the proposed Charter Amendment. Though it is unclear how Powell Crossing first received notice of the July 17, 2014 petition to amend the Powell City Charter, the verified complaint states that Powell Crossing knew about it in time to file a notice of protest on July 28. See Compl., ¶ 56; see also Ohio Const., Art. XVIII, § 9 (providing that public notice be given of all proposed charter amendments).

The opportunity to be heard must be "appropriate to the nature of the case," Loudermill, 470 U.S. at 542, and is evaluated in light of the private interest at stake, "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards," and the state's interest, "including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirements would entail." Mathews v. Eldridge, 424 U.S. 319, 335 (1976). The fundamental requirement is that the property owner receive an opportunity to be heard "'at a meaningful time and in a meaningful manner.'" Id. at 333 (quoting Armstrong v. Manzo, 380 U.S. 545, 552 (1965)).

Powell Crossing initiated the predeprivation hearing process by filing a notice of protest with the Delaware County Board of Elections. See O.R.C. § 3501.39. Upon validating the signatures on the petition, the Board referred the matter to City Council. The court discerns no error in that action, nor does Powell Crossing allege any error, as Ohio law required City Council to draft an ordinance to submit the proposed Charter Amendment to the voters. See Ohio Const., Art. XVIII, §§ 8,9.

After the ordinance to submit the Charter Amendment to voters received its first reading by City Council, Powell Crossing had two weeks to submit legal briefing and prepare for the Council's next public meeting. During that meeting, counsel for Powell Crossing presented the very position

that forms the basis of its procedural due process claim here – that, because the Charter Amendment was a "disguised" referendum on "an administrative matter, Ordinance 2014-10," there was "no authority for this to go to the ballot." See Aug. 19, 2014 Meeting Tr. at 13-15. At the meeting, Petitioners also spoke and the City's Law Director provided his opinion that the Charter Amendment was unconstitutional. City Council defeated the ordinance to submit the proposed Charter Amendment to the voters, with most of the Council members stating on the record the reasons for their vote. Id. at 83-90.

The court finds that the City Council meeting provided Powell Crossing with a meaningful opportunity to be heard.[4] Powell Crossing, which prevailed before City Council, does not argue otherwise. With a significant property interest at stake, Powell Crossing was afforded the opportunity to submit written briefs and have legal counsel make a presentation at the meeting.[5] The meeting also properly balanced the significant interests of the City and the public in the matter, which concerned an upcoming election, the City Charter and development in the City's Downtown Business District. The two-week time frame allowed by City Council ensured its prompt attention to the ballot measure but also provided sufficient time for the City's Law Director to form a legal opinion and for Powell Crossing and Petitioners to submit briefs. The meeting was public and all interested parties had an opportunity to speak.

The fault that Powell Crossing finds with the process is that it was "futile" – that, despite City Council's rejection of the proposed ballot measure, as well as the October 14, 2014 resolution of the Delaware County Board of Elections against the measure, the proposed Charter Amendment still appeared on the ballot and was approved by voters. The court is not persuaded by this argument. City Council's decision had legal effect when it was rendered. The Ohio Supreme Court explained that "[a]s a result of the combined action of the city council and the board of elections, none of the three ballot measures is currently certified for the November 4, 2014 ballot." Ebersole II, 141 Ohio St.3d at 11, 21 N.E.3d at 269.

---

[4]  The court does not hold that due process required the meeting before City Council. The court's task is to "look at what process the plaintiff actually received and ask whether it was sufficient to satisfy the Constitution." McKenna v. Bowling Green State Univ., 568 Fed. App'x 450, 458 (6th Cir. 2014).

[5]  Because no facts were in dispute, Powell Crossing does not allege that it should have had an opportunity to examine witnesses or present evidence at the meeting.

What made the decisions of the local bodies "futile" was not some infirmity in the process; rather, it was the Ohio Supreme Court's decision granting a writ of mandamus requiring the Charter Amendment to be placed on the ballot. Ebersole III, 141 Ohio St.3d 17, 21 N.E.3d 274.  Not only did Powell Crossing receive a meaningful hearing before City Council, it received the added process of review by the Ohio Supreme Court.  Powell Crossing has not demonstrated how its right to procedural due process could have been violated when the state's highest court provided a predeprivation hearing and decision on Powell Crossing's legal challenge to the proposed Charter Amendment.  Cf. Systematic Recycling LLC v. City of Detroit, __ Fed. App'x __, 2015 WL 3620267 at *8 (6th Cir. June 10, 2015) (holding that the "overall process did not deprive [plaintiff] of a meaningful opportunity to present its case" where the process included judicial review of administrative proceedings).  In considering the Mathews factor of what additional procedural safeguards could have been provided, the court finds that direct and timely review by the Ohio Supreme Court was the best procedural safeguard Powell Crossing could have received from the state.

When Powell Crossing complains that the Charter Amendment appeared on the ballot despite the determinations of City Council and the Board of Elections, its complaint really is directed at the Ohio Supreme Court's decision to not accept the legal theories presented by Powell Crossing and not take the action it requested.  Procedural due process guarantees Powell Crossing only "an opportunity to be heard, not to a successful outcome."  RBIII, L.P. v. City of San Antonio, 713 F.3d 840, 845 n.4 (5th Cir. 2013).  In the final analysis, Powell Crossing received a meaningful opportunity to be heard; it had no right to a ruling in its favor.  See Pugel v. Bd. of Trustees of Univ. of Illinois, 378 F.3d 659, 666 (7th Cir. 2004) ("Due process did not entitle [plaintiff] to a favorable result based on this testimony, only to a meaningful opportunity to present it.").

Though not a case cited by Powell Crossing, the Seventh Circuit's decision in Club Misty, Inc. v. Laski, 208 F.3d 615 (7th Cir. 2000), could be read to support a different result here.  In that case, two taverns held liquor licenses that were revocable under Illinois law only for good cause. Under a separate provision of state law, residents of a precinct could vote on whether to prohibit the sale of liquor at a particular street address.  Voters in the precincts where the two plaintiff taverns were located approved such a ballot measure to prohibit the sale of liquor at the taverns.  The Seventh Circuit described the local option election statute as creating a "process for eliminating" interests in the liquor licenses by which voters could target the street addresses of liquor license holders.  Club Misty, 208 F.3d at 619.  The court declared the statute to be unconstitutional:

>When the Illinois legislature stepped from allowing a precinct's voters to vote the precinct dry to allowing the voters to expel a particular disfavored licensee, it crossed the line that protects property holders from being deprived of their property without due process of law.  Although taverns are not the most popular businesses in some quarters, no principle is suggested that would limit the power claimed by the City to the sale of alcoholic beverages.  Its position casts a long shadow over all property rights.
>
>. . .
>
>The statute that is challenged in this case does not authorize the voters to determine, in the manner of zoning, where liquor may be sold . . . it authorizes them to evict a particular seller, as if they were the judges of a housing court or a judge asked to abate a nuisance.
>
>. . .
>
>So the issue "is not too much delegation, but delegation to the wrong body: delegation of judicial decision-making, for example, to people who are not judges." United Beverage Co. of South Bend, Inc. v. Indiana Alcoholic Beverage Comm'n, 760 F.2d 155, 159 (7th Cir. 1985) . . . . That is what Illinois has done and what the due process clause prohibits.

Id., 208 F.3d at 621-22.

Some similarities exist between Club Misty and the case at hand.  In both cases, citizens used available mechanisms to place on the ballot, and approve, measures that deprived a particular property holder of its interest; that is, voters "extinguished a particular person's property right." Club Misty, 208 F.3d at 619.  But the court does not believe the reasoning and holding of Club Misty should extend to this case.  In Club Misty the Illinois legislature passed a law allowing voters to rescind liquor permits with reference to a particular street address.  The due process problem the court found was that the legislature delegated judicial decisionmaking power to non-judges.  Id., 208 F.3d at 622.  Here, the Ohio legislature did not enact legislation authorizing a ballot measure that could deprive Powell Crossing of its property interest.  Nor does Powell Crossing allege that state law creates a process for eliminating property interests.  Powell Crossing in fact alleges something quite different – that Powell residents exceeded their authority under the Ohio Constitution in revoking City Council's approval of the Final Development Plan.  Thus, unlike in Club Misty, state law did not delegate judicial decisionmaking powers to the voters.  See Illinois Clean Energy Cmty. Found. v. Filan, No. 03 C 7596, 2004 WL 1093711, at *10 (N.D. Ill. Apr. 30, 2004) aff'd, 392 F.3d 934 (7th Cir. 2004) ("[T]he Club Misty opinion places the blame for the due process violation on the state, not on the voters.").

Further, the exercise of power in a manner that targets or singles out a property owner, without more, has not been recognized by the Sixth Circuit as a violation of procedural due process in the land use context.  In Nasierowski and Wedgewood, the Sixth Circuit held that when "a governmental unit singles out and specifically targets an individual's property," the legal consequence is that the property owner is entitled to predeprivation notice and a hearing. Nasierowski, 949 F.2d at 896; Wedgewood, 610 F.3d at 354-55.  See also Pearson, 961 F.2d at 1218 (noting that when the subject of a zoning action is an individual parcel, "affected owners of individual parcels may be entitled to personal notice and a due process hearing, including an impartial decisionmaker").  The Sixth Circuit did not hold that the targeting component of government action was a *per se* procedural due process violation.  By contrast, the majority opinion in Club Misty, having found that the statute allowing voters to target license holders was a due process violation in itself, did not discuss whether the taverns had available to them adequate predeprivation process.  See Club Misty, 208 F.3d at 622, 625 (Bauer, J., dissenting) (arguing that the taverns had an opportunity to be heard by way of campaigning against the ballot measures); see also City of Eastlake v. Forest City Enterprises, Inc., 426 U.S. 668, 679 (1976) ("As a basic instrument of democratic government, the referendum process does not, in itself, violate the Due Process Clause of the Fourteenth Amendment when applied to a rezoning ordinance. . . . [T]he Ohio Supreme Court erred in holding invalid, on federal constitutional grounds, the charter amendment permitting the voters to decide whether the zoned use of respondent's property could be altered.").  Here, as discussed above, Powell Crossing had a sufficient opportunity to be heard prior to the deprivation. Cf. Eastlake, 426 U.S. at 680 (Powell, J., dissenting) (stating that a procedure which singles out a person or parcel is unfair if it "afford[s] no realistic opportunity for the affected person to be heard, even by the electorate").

Finally, it should be noted that the Sixth Circuit has largely treated the issue of targeting by voters as substantive due process and equal protection concerns, and not as a procedural due process concern.  See Brookpark Entm't, Inc. v. Taft, 951 F.2d 710 (6th Cir. 1991); 37712, Inc., 113 F.3d 614; Buckeye Cmty. Hope Found. v. City of Cuyahoga Falls, 263 F.3d 627 (6th Cir. 2001), *rev'd on other grounds*, 538 U.S. 188 (2003).  See also City of Cuyahoga Falls v. Buckeye Cmty. Hope Found., 538 U.S. 188, 200, 201 (2003) (Scalia, J., concurring) (stating that where voters used referendum power to repeal city council's approval of a particular property owner's site plans, "[t]here is nothing procedurally defective about conditioning the right to build low-income housing on the outcome of a popular referendum").

Accordingly, the court finds as a matter of law that Powell Crossing's right to procedural due process was not violated.

### B.     Substantive Due Process

Substantive due process is "[t]he doctrine that governmental deprivations of life, liberty or property are subject to limitations regardless of the adequacy of the procedures employed." Pearson, 961 F.2d at 1216 (internal quotation marks omitted).  The doctrine "protects a narrow class of interests, including those enumerated in the Constitution, those so rooted in the traditions of the people as to be ranked fundamental, and the interest in freedom from government actions that 'shock the conscience.'"  Range v. Douglas, 763 F.3d 573, 588 (6th Cir. 2014) (quoting Bell v. Ohio State Univ., 351 F.3d 240, 244-50 (6th Cir. 2003)).  "It also protects the right to be free from 'arbitrary and capricious' governmental actions, which is another formulation of the right to be free from conscience-shocking actions."  Id.

In the zoning and land use context, the Sixth Circuit has held that "[s]ubstantive due process . . . protects citizens from being subject to 'arbitrary or irrational zoning decisions.'"  Paterek v. Vill. of Armada, Mich., 801 F.3d 630, 648 (6th Cir. 2015) (quoting Pearson, 961 F.2d at 1217).  "To succeed on a substantive due process claim based on this theory, a plaintiff is required to show that '(1) a constitutionally protected property or liberty interest exists, and (2) the constitutionally protected interest has been deprived through arbitrary and capricious action.'"  Id. (quoting Braun, 519 F.3d at 573).  Courts are not to "interfere with local zoning decisions unless the locality's action has no foundation in reason and is a mere arbitrary or irrational exercise of power having no substantial relation to the public health, the public morals, the public safety or the public welfare."  Warren, 411 F.3d at 707 (internal quotation marks omitted).  See also Eastlake, 426 U.S. at 676 (holding that a property owner must show that the zoning restriction is "'clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare'") (quoting Vill. of Euclid, Ohio v. Ambler Realty Co., 272 U.S. 365, 395 (1926)).

Defendant City of Powell argues that the City itself has not violated Powell Crossing's substantive due process rights.  The City notes that its action of putting the Charter Amendment on the ballot was not arbitrary because it did so pursuant to a writ of mandamus from the Ohio Supreme Court.  See Ebersole III, 141 Ohio St.3d at 20, 21 N.E.3d at 277 ("The city council and the city clerk are hereby ordered to take all steps necessary to place the proposed charter amendment on the November 4, 2014 ballot and to submit the question to those voters who have already secured absentee voter ballots.").

26

The court agrees with the City that Powell Crossing has not identified any arbitrary conduct committed by the City or one of its officials.  The City took two actions, both of which it was required by law to take.  In placing the Charter Amendment on the ballot, the City followed the order of the Ohio Supreme Court.  Cf. Cuyahoga Falls, 538 U.S. at 198-99 (holding that a city engineer's refusal to issue building permits was not arbitrary because he acted pursuant to a "rational directive" of the city's law director).  And the Ohio Constitution required the City to recognize the Charter Amendment as valid once voters approved it.  See Ohio Const., Art. XVIII, § 9 ("If any such amendment is approved by a majority of the electors voting thereon, it shall become a part of the charter of the municipality.").

Powell Crossing's substantive due process claim thus hinges on its ability to show that the "substantive result of the [ballot measure] is arbitrary and capricious, bearing no relation to the police power."  Eastlake, 426 U.S. at 676.  Two of Powell Crossing's theories miss this mark because they rest on alleged violations of state law.  One theory offers that the Charter Amendment is arbitrary and capricious because, under Article II, Section 1f of the Ohio Constitution, administrative decisions "must be free from repeal by any ballot measure."  Doc. 19 at 5-6.  In Cuyahoga Falls the United States Supreme Court rejected such a theory based on the state law distinction between legislative and administrative actions:

> [R]espondents contend that the City violated substantive due process . . . on the grounds that the City's submission of an administrative land-use determination to the charter's referendum procedures constituted *per se* arbitrary conduct.
>
> . . .
>
> Respondents' [] theory of liability has no basis in our precedent.  As a matter of federal constitutional law, we have rejected the distinction that respondents ask us to draw, and that the Ohio Supreme Court drew as a matter of state law, between legislative and administrative referendums.  In Eastlake v. Forest City Enterprises, Inc., 426 U.S., at 672, 675, 96 S.Ct. 2358, we made clear that because all power stems from the people, "[a] referendum cannot ... be characterized as a delegation of power," unlawful unless accompanied by "discernible standards."  The people retain the power to govern through referendum "'with respect to any matter, legislative or administrative, within the realm of local affairs.'"  Id., at 674, n. 9, 96 S.Ct. 2358.  Cf. James v. Valtierra, 402 U.S. 137, 91 S.Ct. 1331. . . . The subjection of the site-plan ordinance to the City's referendum process, regardless of whether that ordinance reflected an administrative or legislative decision, did not constitute *per se* arbitrary government conduct in violation of due process.

538 U.S. at 199.

Powell Crossing's other theory along these lines is that the Charter Amendment offends substantive due process because it violates state law prohibitions against retroactive laws.[6]  See O.R.C. §713.15 (retroactive zoning ordinances prohibited); Ohio Const., Art. II, § 28 ("The general assembly shall have not power to pass retroactive laws . . . .").  But again "an error of state law is not a violation of due process."  Indiana Land Co., LLC v. City of Greenwood, 378 F.3d 705, 711 (7th Cir. 2004); see also Hutchison v. Marshall, 744 F.2d 44, 46 (6th Cir. 1984) ("[I]t has long been recognized that 'a mere error of state law' is not a denial of due process.") (quoting Gryger v. Burke, 334 U.S. 728, 731 (1948)); DePoutot v. Raffaelly, 424 F.3d 112, 119 (1st Cir. 2005) ("Mere violations of state law, even violations resulting from bad faith, do not necessarily amount to unconstitutional deprivations of substantive due process.").  That the Charter Amendment deprived Powell Crossing of an already-granted property interest in its development plan certainly establishes the threshold elements of a due process claim (deprivation of a protected property interest).  And that voters effectively negated City Council's determination that the plan was a suitable use of property in the Downtown Business District certainly warrants further inspection from the court as to the substantive result of the Amendment.  Nonetheless, the alleged violations of state law, even if true, alone do not suffice to prove that the result bears no substantial relation to public health, safety, morals or general welfare.

Powell Crossing next contends that the Charter Amendment arbitrarily and capriciously singles out Powell Crossing and the Final Development Plan.  Powell Crossing's theory in this regard, however, re-states its equal protection claim in the sense that it focuses on allegedly disparate treatment of plaintiff as compared to similarly-situated property owners.[7]  See Gypsum Res., LLC v. Masto, 672 F.Supp.2d 1127, 1146 (D. Nev. 2009) ("To the extent Plaintiff brings a substantive due process claim because he was "'singled out,' this is already a part of his equal protection claim . . . .").

---

[6] The complaint does not assert an independent claim for violations of the state prohibitions against retroactive laws.  Rather, the allegations are made in support of the federal substantive due process claim.  See Compl., ¶ 109(f).  The only state law claim asserted in the complaint is for a violation of Article II, Section 1f of the Ohio Constitution.

[7] See Doc. 2 at 19 ("Nor can the City single out Powell Crossing . . . while ignoring other similarly situated property owners who were approved to construct multi-family residential development . . . ."); id. at 22 ("The Charter Amendment does not mention any other property owners or apply the same bar against certain uses to other similarly situated owners."); Doc. 19 at 5 ("[N]o other property owner is banned from developing its property consistent with the City's existing zoning – except Powell Crossing. . . . "[O]ther landowners in the same zoning district are not prohibited from constructing a 'high-density housing' development . . . .").

Courts may not expand the concept of substantive due process to redress conduct for which another constitutional protection applies.  Albright v. Oliver, 510 U.S. 266, 273 (plurality opinion of Rehnquist, C.J.) ("Where a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims.") (internal quotation marks omitted); Graham v. Connor, 490 386, 395 (1989); Warren, 411 F.3d at 706-07 ("[S]ubstantive due process concepts are not available to provide relief when another provision of the Constitution directly addresses the type of illegal government conduct alleged by the plaintiff.").

Again the "critical constitutional inquiry" is whether the Charter Amendment "produces arbitrary or capricious results."  Eastlake, 426 U.S. at 675 n.10.  Courts have long held that restrictions on multi-family or high-density dwellings rationally serve legitimate government interests in limiting motor vehicle traffic and reducing noise.  In Village of Belle Terre v. Boraas, 416 U.S. 1, 9 (1974), the Supreme Court upheld a zoning ordinance which limited the use of land to one-family dwellings.  It held that the police power is "ample" to create "[a] quiet place where yards are wide, people few, and motor vehicles restricted" and thereby preserve "the blessing of quiet seclusion and clean air."  Id.  See also Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252 (1977) (holding that the denial of a building permit for multi-family, low-income housing was in accordance with a rational zoning scheme); White Oak Prop. Dev., LLC v. Washington Twp., Ohio, 606 F.3d 842, 853 (6th Cir. 2010) (holding that a prohibition on multi-family housing did not violate substantive due process because, among other reasons, it was rationally related to "the preservation of open space"); Braun, 519 F.3d at 574 (holding that the denial of a proposed high-density development did not violate substantive due process because among the "numerous justifications" for the denial was "public safety concerns such as higher traffic flow").

Powell Crossing argues that the Charter Amendment is an example of "spot zoning." "'[S]pot-zoning' refers to the singling out of a lot or a small area for discriminatory or different treatment from that accorded surrounding land which is similar in character."  Willott v. Vill. of Beachwood, 175 Ohio St. 557, 559, 197 N.E.2d 201, 203 (Ohio 1964).  Powell Crossing contends that its property is being subjected to discriminatory treatment.  Though the cases cited by Powell Crossing are not controlling, see Renner v. Makarius, No. CA 5993, 1979 WL 208364 (Ohio Ct. App. Aug. 3, 1979); Smith v. Skagit Cnty., 453 P.2d 832, 848 (Wash. 1969), the argument to be made is that the usual concerns over noise and traffic congestion associated with multi-family housing

carry less weight here because Powell Crossing's proposed development lies in the City's Downtown Business District, where multi-family housing, retail shops and office facilities are permitted.[8]  See City of Powell Code § 1143.16.2(b).

Anticipating this argument, Petitioners contend that adding 64 apartment units (the number proposed in the Final Development Plan, see Compl, Ex. C at PAGEID#304) will substantially strain an area that already suffers from significant traffic congestion.  The evidentiary record offers support for this contention.  The City Planning and Zoning Commission issued a report on the Final Development Plan and noted its "concern with traffic safety along Olentangy Street."  Compl., Ex. C at PAGEID #289 (Feb. 12, 2014 Report of the City Planning & Zoning Commission).  "This development will add an access point and additional drivers to *an already maxed out roadway*.  This, coupled with the railroad crossing near the development site, could have potential problems."  Id. (emphasis added).  Other city officials concurred that Olentangy Street was already "at capacity" and reaching a "tipping point."  Compl., Ex. D at PAGEID #348 (June 17, 2014 Meeting Minutes; comments of traffic engineer Doyle Clear and Councilman Bennehof); Compl., Ex. C at PAGEID #275 (Feb. 12, 2014 Meeting Minutes; comments of Planning & Zoning Commissioner Bill Little); Compl., Ex. D at PAGEID #353 (comments of Councilman Counts that he believed, based on the results of surveys conducted, the City's "traffic woes" had reached "a tipping point").  During City Council's June 17, 2014 meeting, one councilman, who stated that he had consulted with the City's Chief of Police, expressed his concern about the impact on traffic that 64 apartment units would have and opined that "the railroad crossing is an accident waiting to happen."  Compl., Ex. D at PAGEID #355 (comments of Councilman Crites, noting that the Chief of Police was concerned about "the volume of traffic and the safety issue" and viewed the railroad crossing as "a significant safety problem").

One could respond to the Petitioners' argument by pointing out that the Commission and others felt that certain measures could be taken to mitigate the proposed development's effect on traffic.  See Compl., Ex. C at PAGEID #289 (Planning & Zoning Commission's proposal of adding a turn lane and traffic controls at the railroad crossing); Compl., Ex. D at PAGEID #356 (comments of Mayor Hrivank).  But see Compl., Ex. D at PAGEID #348 (comments of traffic engineer Doyle Clear and Councilman Bennehof that "regardless" of any road improvement made

---

[8]  Powell Crossing's spot zoning argument emphasizes the alleged discriminatory nature of the Charter Amendment, again echoing its equal protection claim.  The court believes that the stronger substantive due process argument to be made from the facts is that the Charter Amendment does not rationally serve the City's interests in public safety.

for the Powell Crossing development, the volume of traffic will not be reduced).  One could also observe that the traffic and safety concerns were sometimes voiced in the context of high-density housing and downtown development as a whole, and not necessarily the discrete impact that Powell Crossing's development would have.

Even so, this court's role is not "to act as a super-zoning board."  Schenck v. City of Hudson, 114 F.3d 590, 594 (6th Cir. 1997) (citing Exxon Corp. v. Governor of Maryland, 437 U.S. 117, 124 (1978) ("[T]he Due Process Clause does not empower the judiciary to sit as a superlegislature to weigh the wisdom of legislation.") (internal quotation marks omitted)).  The court should not attempt to determine whether a turn lane or other alternative measures would be advisable or cost-effective in addressing the burden that the development would put on the surrounding area.  See National Paint & Coatings Ass'n v. City of Chicago, 45 F.3d 1124, 1129 (7th Cir. 1995) ("If there are alternative ways of solving a problem, [the federal courts] do not sit to determine which of them is best suited to achieve a valid state objective."); accord Interstate Towing Ass'n, Inc. v. City of Cincinnati, 6 F.3d 1154, 1166 (6th Cir. 1993).  Nor should the court attempt to pick winners from the opposing sides of zoning and planning issues that are "'fairly debatable.'" Lakewood, Ohio Congregation of Jehovah's Witnesses, Inc. v. City of Lakewood, Ohio, 699 F.2d 303, 308 (6th Cir. 1983) (quoting Euclid, 272 U.S. at 388).  The court should limit its inquiry to whether "any conceivable legitimate governmental interest supports the contested ordinance." 37712, Inc., 113 F.3d at 620.  See also Pearson, 961 F.2d at 1223 (noting that in the context of a substantive due process claim, a federal court's review of the evidence should be "extremely limited"); Coniston Corp. v. Vill. of Hoffman Estates, 844 F.2d 461, 4463-64 (7th Cir. 1988) ("At worst the [zoning] decision here was mistaken and protectionist; it was not irrational, so the claim of a denial of substantive due process fails."); St. Paul's Protestant Episcopal Church v. City of Oakwood, No. C-3-88-230, 1998 WL 1657172 at *7 n.21 (S.D. Ohio Mar. 3, 1998) (holding that courts must respect the lines drawn in zoning matters unless they are "'very wide of any reasonable mark'") (quoting Belle Terre, 416 U.S. at 8 n.5 (quoting Louisville Gas Co. v. Coleman, 277 U.S. 32, 41 (1928) (Holmes, J., dissenting))).

For purposes of due process analysis, it suffices for this court to find that the solution which a majority of Powell voters approved – not allowing the development to be built – cannot be said to lack a rational relationship to the legitimate traffic and safety concerns reflected in the record.  See Braun, 519 F.3d at 574; Pearson, 961 F.2d at 1224 ("The city legislative body heard evidence and statements by citizens who were concerned about traffic problems and over-commercialization of

the area. . . .   Thus, its action and the facts before it were rationally related to zoning."); Lee v. Whispering Oaks Home Owners' Ass'n, 797 F.Supp.2d 740, 753 (W.D. Tex. 2011) (dismissing substantive due process challenge to the denial of a rezoning request, which would have increased "residential density on the property," because the denial rationally related to avoiding the "danger from increased traffic at an already busy and dangerous intersection").

Finally, the court notes a short line of judicial opinions that could arguably support Powell Crossing's due process claim.  These opinions find a due process problem in subjecting property interests to the "whim" of voters.  In a dissenting opinion in Eastlake, Justice Stevens examined the fairness of a city charter provision that required all land use changes to be approved by referendum.[9] He concluded that the charter provision was arbitrary and subjected a landowner's "particular use of a particular parcel of land" to "the capricious character of a decision supported by majority sentiment rather than reference to articulable standards."  Eastlake, 426 U.S. at 680, 690 (Stevens, J., dissenting) (footnote omitted).  In reaching that conclusion, Justice Stevens quoted with approval a concurring opinion in the decision below by the Ohio Supreme Court, whose judgment was reversed Eastlake:

> The charter provision was apparently adopted specifically, to prevent multi-family housing . . . .  The restrictive purpose of the provision is crudely apparent on its face. Any zoning change, regardless of how minor, and regardless of its approval by the Planning Commission and the City Council, must be approved by a city-wide referendum. . . . .
>
> . . . We need only imagine the adoption of this same provision in a city such as Cleveland.  By such a provision, rezoning for a corner gasoline station would require the approval of hundreds of thousands of voters, most of them living miles away, and few of them with the slightest interest in the matter.  This would be government by caprice, and would seriously dilute the right of private ownership of property. The law recognizes that the use a person makes of his property must inevitably affect his neighbors and, in some cases, the surrounding community.  These real interests are entitled to be balanced against the rights of a property owner; but a law which requires a property owner, who proposes a wholly benign use of his property, to obtain the assent of thousands of persons with no such interest, goes beyond any reasonable public purpose.

Forest City Enterprises, Inc. v. City of Eastlake, 41 Ohio St. 2d 187, 198, 199-200, 324 N.E.2d 740, 748, 748-49 (Ohio 1975) (Stern, J., concurring), *rev'd*, 426 U.S. 668 (1976) (quoted with approval in Eastlake, 426 U.S. at 680, 689-90 (Stevens, J., dissenting)).

---

[9]   In Eastlake, the Court upheld the provision against a claim that it represented an unlawful delegation of legislative power.  Eastlake, 426 U.S. at 675.

This theme regarding the arbitrary nature of voter action appeared again in Brookpark Entertainment, Inc. v. Taft, 951 F.2d 710 (6th Cir. 1991). Similar to the facts of Club Misty, in Brookpark an Ohio statute allowed for the revocation of liquor licenses by popular referendum. The court struck down the statute as unconstitutional under the Due Process Clause.[10] It found that the "fundamental problem with the Ohio 'particular premises' law is the arbitrariness inherent in a referendum." Brookpark, 951 F.2d at 716. The court noted the potential for voters to "gang up" and "close only those establishments that they dislike" for reasons "'unrelated to any plausible public interest.'" Id. (quoting Philly's v. Byrne, 732 F.2d 87, 92 (7th Cir. 1984)). "[S]uch arbitrary targeting violates a licensee's due process rights." Id. at 717.

This court remains persuaded that Powell Crossing has not demonstrated a substantive due process violation. Both Justice Stevens and the court in Brookpark found a due process violation in allowing voters to determine the rights of a property holder; it created a potential or "risk" of voters acting for reasons unrelated to the public interest. Brookpark, 951 F.2d at 716. However, the majority in Eastlake and a unanimous court in Cuyahoga Falls held that a substantive due process violation occurs only if the substantive result in fact does not serve a rational purpose. See Cuyahoga Falls, 538 U.S. at 199 (holding that subjecting "the site-plan ordinance to the City's referendum process" did not offend substantive due process); Eastlake, 426 U.S. at 676.

Though the implementation of change through popular referendum does not "immunize it" from constitutional limitations, Hunter v. Erickson, 393 U.S. 385, 392 (1969), the results of the democratic process "deserve initial respect in the courts." Coalition to Defend Affirmative Action v. Regents of the Univ. of Mich., 701 F.3d 466, 505 (6th Cir. 2012) (Sutton, J., dissenting), rev'd sub nom Schuette v. BAMN, __ U.S. __, 134 S.Ct. 1623 (2014). Powell Crossing must establish that the substantive result of the vote is arbitrary and capricious, not that it merely could be. It has not so demonstrated, as the record contains facts supporting a rational relationship between the Charter

---

[10] The court in Brookpark did not categorize its analysis as either procedural or substantive due process. Portions of the Brookpark opinion are similar to the analysis of Club Misty, an opinion issued nine years later which cited Brookpark but did not discuss it. The court in Brookpark stated, for instance, that "the Ohio 'particular premises' statute is not a valid delegation of legislative power." Brookpark, 951 F.2d at 716. Yet the court employed the words "arbitrary" and "capricious" to such an extent that a later Sixth Circuit opinion characterized Brookpark as holding that the Ohio statute "violated due process strictures because it arbitrarily and capriciously permitted the local electorate to forbid sales of alcohol at a particular business premise." 37712, Inc., 113 F.3d at 620 (emphasis in original). See also Buckeye Cmty., 263 F.3d at 643 (citing Brookpark in its discussion of substantive due process), rev'd, 538 U.S. 188 (2003).

Amendment and the City's legitimate interests in traffic and public safety.  Accordingly, Powell Crossing's substantive due process claim fails.  See 37712, Inc., 113 F.3d at 620 n.11 ("The electorate's actual reason for forestalling some types of retail alcohol sales within their community, while permitting other types, is irrelevant, as long as some identifiable legitimate public interest is arguably advanced by the enacted restriction."); Shanks v. Dressel, 540 F.3d 1082, 1088 (9th Cir. 2008) ("[T]he irreducible minimum of a substantive due process claim challenging land use action is failure to advance any legitimate governmental purpose.").

### C.     Void for Vagueness

"A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required."  FCC v. Fox Television Stations, Inc., __ U.S. __, 132 S.Ct. 2307, 2317 (2012).  Due process requires that an enactment "establish standards . . . that are sufficient to guard against the arbitrary deprivation of liberty interests."  City of Chicago v. Morales, 527 U.S. 41, 52 (1999) (plurality); see also D.C. and M.S. v. City of St. Louis, Mo., 795 F.2d 652, 653 (8th Cir. 1986) ("The 'void-for-vagueness doctrine' is embodied in the due process clauses of the fifth and fourteenth amendments.").  An enactment is void for vagueness if it "'fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement.'"  Fox, __ U.S. at __, 132 S.Ct. at 2317 (quoting United States v. Williams, 553 U.S. 285, 304 (2008)); see also Libertarian Party of Ohio v. Husted, 751 F.3d 403, 421-22 (6th Cir. 2014).

"Vagueness challenges to statutes not threatening First Amendment interests are examined in light of the facts of the case at hand; the statute is judged on an as-applied basis."  Maynard v. Cartwright, 486 U.S. 356, 361 (1988)).  Further, the degree of vagueness tolerated "depends in part on the nature of the enactment."  Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 498 (1982).  The Due Process Clause has "greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe."  Id. at 498-99; see also Libertarian Party, 751 F.3d at 422 ("The strictness of our vagueness scrutiny is proportionate to the burden that the law imposes on those whom it regulates.").

Powell Crossing contends that the "Uncodified" paragraph of the Charter Amendment is impermissibly vague.  That provision states:

> No party, public or private, shall take any actions, including but not limited to construction activity, in reliance upon Ordinance 2014-10 and the Final Development Plan for the Center at Powell Crossing LLC, a development of 14,000 sq. ft. of retail in two buildings, preserving the old house for commercial use, and

development of 64 apartment residential units on 8.3 acres, located at 147 W. Olentangy Street.  The subject property for the Ordinance 2014-10 Final Development Plan shall remain economically viable for other uses, including residential and non-residential uses, notwithstanding this amendment to the City Charter of Powell, Ohio.

Charter Am., Uncodified ¶ 1.  Powell Crossing argues that the first sentence of the provision appears to forbid "retail," "commercial" and "apartment residential" uses of the land, such that it is unclear what "other uses" remain permitted by the provision's second sentence.

The court finds that Powell Crossing's interpretation of the provision is not a plausible one. In using the words "retail," "commercial" and "apartment residential," the provision merely defines or describes the Final Development Plan.  This exact language is repeated throughout the Charter Amendment in referring to the Development Plan.  See Charter Am., Second Whereas Clause and Art. 4, § 21.  The first sentence of the Uncodified paragraph forbids actions taken in reliance upon Ordinance 2014-10.  It plainly prohibits Powell Crossing from taking any steps in furtherance of its Final Development Plan.  The second sentence of the Uncodified paragraph allows for a new plan to be drawn and for the land to be put to any use not forbidden by the Charter Amendment and otherwise permitted by the city's zoning code.  The only use forbidden by the Charter Amendment is "high-density housing."[11]  Id., Art. 4, § 19.  Powell Crossing thus would still be able to use its land for retail shops, office facilities and single-family dwellings, among other uses.  See City of Powell Code § 1143.16.2.

Accordingly, the court finds that the challenged provision of the Charter Amendment provides persons of ordinary intelligence fair notice of what is prohibited and is not so standardless that it authorizes or encourages discriminatory enforcement.

### D.    Unlawful Delegation of Legislative Authority

Powell Crossing's final due process claim concerns the provisions of the Charter Amendment that require the appointment of a Comprehensive Plan Commission to overhaul the City's zoning and development plan.  Powell Crossing argues that the Charter Amendment's broad delegation of power to the Commission, comprised of five private citizens, is unconstitutional.  The court agrees.  The Due Process Clause of the Fourteenth Amendment limits "the manner and

---

[11] "High-density housing" is expressly defined by the Charter Amendment, and Powell Crossing does not argue that its definition is vague.

extent" to which legislative authority may be delegated to private parties.[12]  See Biener v. Calio, 361 F.3d 206, 216 (3d Cir. 2004).  The Supreme Court articulated this facet of due process law in Eubank v. Richmond, 226 U.S. 137 (1912) and Washington ex rel. Seattle Title Trust Co. v. Roberge, 278 U.S. 116 (1928), wherein the Court condemned "the standardless delegation of power to a limited group of property owners."  Eastlake, 426 U.S. at 678.

In Eubank the Court invalidated a city ordinance that empowered certain owners of property abutting city streets to establish, within a specified range, a building set-back line for their street.

> [P]art of the property owners fronting on the block determine the extent of use that other owners shall make of their lots, and against the restriction they are impotent. This we emphasize.  One set of owners determines not only the extent of use, but the kind of use which another set of owners may make of their property.  In what way is the public safety, convenience, or welfare served by conferring such power? The statute and ordinance, while conferring the power on some property holders to virtually control and dispose of the property rights of others, creates no standard by which the power thus given is to be exercised; in other words, the property holders who desire and have the authority to establish the line may do so solely for their own interest, or even capriciously.

Eubank, 226 U.S. at 143-44; see also Roberge, 278 U.S. at 121-22 (invalidating an ordinance that gave "uncontrolled" authority over a zoning matter to a limited group of property owners, whose action was not subject to review).

Thus, a delegation of legislative authority offends due process when it is made to an unaccountable group of individuals and is unaccompanied by "discernible standards," such that the delegatee's action cannot be "measured for its fidelity to the legislative will."  Eastlake, 426 U.S. at 675.  Eubank and Roberge "stand for the proposition that a legislative body may not constitutionally delegate to private parties the power to determine the nature of rights to property in which other individuals have a property interest, without supplying standards to guide the private parties' discretion."  Gen. Elec. Co. v. New York State Dep't of Labor, 936 F.2d 1448, 1455 (2d Cir. 1991).

---

[12]  Petitioners incorrectly characterize the unlawful delegation claim as "a purely state law claim" and argue that the court should abstain not only from deciding "this purely local issue," doc. 13-1 at 33, but also from deciding Powell Crossing's federal claims until the allegedly local issue is resolved in state court.  See Railroad Commission of Texas v. Pullman Co., 312 U.S. 496 (1941).  The delegation claim, however, arises under the United States Constitution and does not implicate any unsettled issues of state law.  See Entm't Software Ass'n v. Granholm, No. 05-cv-73634, 2006 WL 148756 at *2 (E.D. Mich. Jan. 19, 2006) ("In this case, Count IV is based on violations of due process under the United States Constitution.  There is no reason for this court to abstain from considering the delegation issue set forth in Count IV.").

The Charter Amendment provides that the City's existing plan for zoning and development is "outdated" and "in need of wholesale revision." Charter Am., First Whereas Clause. The Amendment establishes a procedure by which a new comprehensive zoning and development plan will be enacted as legislation. The Amendment requires that a Comprehensive Plan Commission be organized and have as its members five presidents of certain Powell-area homeowners associations. Id., Art. 4, § 14. The Commission must follow a three-phase process in drafting a new comprehensive plan to submit to City Council. In Phase I, the Commission makes "findings regarding the current state of the Powell community's character and identity in light of current socioeconomic conditions." Id., Art. 4, § 15. In Phase II, the Commission drafts a "composite plan identifying specific zones and/or districts that reflect the natural, cultural, and visual elements of the City of Powell." Id. In Phase III, the Commission is to "make recommendations to City Council" in the form of a preliminary comprehensive plan. Id. The Commission must hold at least two public workshops "to receive public input" regarding the plan. Id., Art. 4, § 16. The Commission then submits its plan to City Council, which may "make adjustments as necessary [and] consistent with the Phase I findings of [the] Comprehensive Plan Commission" and must "pass an ordinance . . . legislatively adopting a Final Comprehensive Plan." Id., Art. 4, § 18. Future city ordinances "must comply" with the new plan. Id., Art. 4, § 20.

The Amendment identifies certain "criteria" that the new comprehensive plan must be "in compliance with": the "needs and desires" of Powell residents; the "natural, cultural, and visual elements" of Powell; limiting traffic congestion; balancing "residential and non-residential land use"; making parking available for retail areas; and prohibiting "high-density housing" in the Downtown Business District. Charter Am., Art. 4, § 19. Further, the new plan "legislatively adopted pursuant to Section 18 of this Article IV shall not be compatible with Ordinance 2014-10." Id., Art. 4, § 18.

The Charter Amendment's delegation of power falls well short of satisfying the requirements of due process. As an initial matter, the court finds that the power delegated to the Comprehensive Plan Commission is legislative in nature.[13] The term "comprehensive plan" may sometimes refer to a non-binding, general set of objectives for future municipal development. See, e.g., Gross Builders v. City of Tallmadge, No. 22484, 2005 WL 196675 at *9 (Ohio Ct. App. Aug. 17, 2005) ("In cases involving a comprehensive plan or a master plan that was not incorporated into a city's zoning code, courts have held that the city should not consider these general aspirations in evaluating whether a

---

[13]  That the voters, rather than a legislative body, delegated the power does not alter the court's analysis. Citizens Against Rent Control v. City of Berkeley, 454 U.S. 290, 295 (1981).

proposed use complies with the city's standards for permitted use."); Durant v. D.C. Zoning Comm'n, 65 A.3d 1161, 1168 (D.C. Ct. App. 2013) (finding that a comprehensive plan was "not a code of prohibitions" but "serve[d] as an important policy guide").  Here, however, the Charter Amendment mandates that the Commission's plan ultimately be "legislatively adopt[ed]" by City Council, whose elected members comprise the City's legislative body.  See Powell City Charter, Art. IV § 4.01.  The Charter Amendment further mandates that all zoning ordinances must comply with the new plan.  The new plan thus carries the binding effect of law.  See Visconsi-Royalton, Ltd. v. City of Strongsville, No. 83128, 2004 WL 2071522 at *5 (Ohio Ct. App. Sept. 16, 2004) (observing that, where city council had legislatively adopted a comprehensive plan, the "Strongsville comprehensive plan is significant because the Strongsville zoning code, unlike that of most other municipalities, specifically provides for zoning in accordance with the objectives of the comprehensive plan").

Though not contesting that the new comprehensive plan is legislative in nature, Petitioners argue that the Comprehensive Plan Commission functions merely as an advisory committee. Petitioners highlight that the Charter Amendment calls for the Commission to "make recommendations to City Council" and argue that the Commission's plan is non-binding.

The court finds that Charter Amendment's use of the descriptive term "recommendations" in reference to the plan drafted by the Comprehensive Plan Commission is inconsistent with the unambiguous language of the operative and controlling provisions of the Amendment.  The Amendment provides that City Council must legislatively adopt a new comprehensive plan that is submitted to it by the Comprehensive Plan Commission.  See Charter Am., Art. 4, § 18.  That is, there is no source for a new plan other than the one submitted by the Commission.  Further, Council's input or discretion regarding the plan is confined to making only those "adjustments as necessary [and] consistent with the Phase I findings of [the] Comprehensive Plan Commission."  Id. The Amendment leaves no room for independent fact-finding or rule-making by City Council; it is the Commission who establishes the findings, policies, guidelines and standards by which all zoning ordinances must comply.  On this point, the court concurs with the analysis of the Ohio Supreme Court in its decision (later vacated on ripeness grounds) holding that the Charter Amendment unlawfully delegates legislative power:

> [T]he city council's authority in this process would be sharply constrained by the findings of the five private citizens on the commission.  Specifically, when adopting a final plan, the city council would be permitted to "make adjustments" to the commission's preliminary plan only to the extent that they are consistent with the

commission's findings at Phase I.  And the proposed charter amendment does not set forth any standards to govern those findings.  In short, the city council would be deprived of final decision-making authority over zoning matters.

Ebersole II, 141 Ohio St.3d at 13-14, 21 N.E.3d at 271.

Finally, the delegation of authority to the Comprehensive Plan Commission is unaccompanied by discernible standards.  The Charter Amendment sets only the vaguest of parameters for the Commission's fact-finding – that the findings regard "the current state of the Powell community's character and identity in light of current socioeconomic conditions."  In similar fashion, the Amendment broadly charges the Commission to create a comprehensive plan that serves the "needs and desires" of Powell residents, preserves the "natural, cultural, and visual elements" of Powell and balances "residential and non-residential land use."  These are not specific standards by which the Commission must act, but rather are sweeping areas of concern for which the Amendment leaves the Commission with full discretion to formulate policy, with the lone mandate that high-density housing not be allowed in the Downtown Business District.  Such a standardless delegation of legislative power to five private citizens, each of whom directly represent the interests of area homeowners' associations, plainly violates due process of law.  See Eubank, 226 U.S. at 143-44; Roberge, 278 U.S. at 121-22; Dep't of Transp. v. Ass'n of Am. Railroads, __ U.S. __, 135 S.Ct. 1225, 1234, 1237-38 (2015) (Alito, J., concurring) ("When it comes [to delegating] to private entities, however, there is not even a fig leaf of constitutional justification.  Private entities are not vested with 'legislative Powers.' . . .  By any measure, handing off regulatory power to a private entity is 'legislative delegation in its most obnoxious form.'") (quoting U.S. Const., Art. I, § 1; Carter v. Carter Coal Co., 298 U.S. 238, 311 (1936)); Santa Fe Nat'l Tobacco Co. v. Judge, 963 F.Supp. 437, 441 (M.D. Pa. 1997); Suss v. Am. Soc'y for Prevention of Cruelty to Animals, 823 F.Supp. 181, 188 (S.D.N.Y. 1993) ("For an interested party to make decisions utilizing governmental authority is anathema to due process.").

Accordingly, the court finds that the provisions of the Charter Amendment which require the Comprehensive Plan Commission to create a new comprehensive plan are unconstitutional.

## VI.     Bill of Attainder

Under Article I § 10 of the Constitution, "No State shall . . . pass any Bill of Attainder."  A bill of attainder is a "law that legislatively determines guilt and inflicts punishment upon an identifiable individual without provision of the protections of a judicial trial."  Selective Serv. Sys. v.

Minnesota Pub. Interest Research Grp., 468 U.S. 841, 846-47 (1984) (internal quotation marks omitted).  The prohibition "implements the doctrine of separation of powers" in that it forbids the legislative branch from performing the "the task of ruling upon the blameworthiness of, and levying appropriate punishment upon, specific persons."  SeaRiver Mar. Fin. Holdings, Inc. v. Mineta, 309 F.3d 662, 668 (9th Cir. 2002) (internal quotation marks omitted).  The essential elements to a bill of attainder are "specificity . . ., punishment, and lack of a judicial trial."  Selective Serv.,468 U.S. at 847; Wilson v. Yaklich, 148 F.3d 596, 605-06 (6th Cir. 1998).

Powell Crossing's theory regarding the prohibition against bills of attainder is not clear.  The complaint made a solitary reference to bills of attainder in one of the counts for a due process violation.  See Compl. at ¶ 109(e) (alleging in Count II that Powell Crossing's "property interests have been singled out and voided through a bill of attainder").  In its motion for injunctive relief, Powell Crossing discussed the constitutional prohibition against bills of attainder in the context of its substantive due process claim.  See Doc. 2 at 21-22.  Powell Crossing's reply briefs did not mention bills of attainder.  See Doc. 19, Doc. 27 at 14 n.3 (not including bill of attainder in its summary of the claims).  Powell Crossing thus appears to be incorporating bill of attainder concepts into its due process claims rather than asserting a stand-alone bill of attainder claim.

Even if the court were to treat the bill of attainder allegations as asserting an independent claim, the claim would fail.  The failing is not be with the element of specificity, for the Charter Amendment identifies Powell Crossing by name, its property by street address and its development plan by ordinance number.  See Elgin v. U.S. Dep't of Treasury, 641 F.3d 6, 19 (1st Cir. 2011), aff'd, 132 S.Ct. 2126 (2012) ("Typical bills of attainder evince specification by naming the person to be punished.").  But Powell Crossing has failed to establish how the punishment element is satisfied by the deprivation of its property interest in the development plan.  See Communist Party of the U.S. v. Subversive Activities Control Bd., 367 U.S. 1, 83 (1961) (holding that "only the clearest proof could suffice to establish the unconstitutionality of a statute" as a bill of attainder) (internal quotation marks omitted).

In determining whether a law inflicts punishment, the court considers: "(1) whether the challenged statute falls within the historical meaning of legislative punishment; (2) whether the statute, viewed in terms of the type and severity of burdens imposed, reasonably can be said to further nonpunitive legislative purposes; and (3) whether the legislative record evinces a congressional intent to punish."  Selective Serv., 468 U.S. at 852 (internal quotation marks omitted).

The Charter Amendment, in preventing Powell Crossing from developing its land in the manner approved by Ordinance 2014-10, does not inflict punishment from a historical perspective. See Foretich v. United States, 351 F.3d 1198, 1218 (D.C. Cir. 2003) (noting that the historical "checklist includes sentences of death, bills of pains and penalties, and legislative bars to participation in specified employments or professions"); cf. N&N Catering Co., Inc. v. City of Chicago, 37 F.Supp.2d 1056, 1075 (N.D. Ill. 1999) (finding "no basis to deem the loss of a liquor license as punishment in the historical sense").  While the confiscation of property by the Crown was considered to be a bill of pain or penalty in colonial times, Powell Crossing does not allege that its property was seized without compensation.  See Nixon v. Adm'r of Gen. Servs., 433 U.S. 425, 474 (1977) (rejecting bill of attainder theory where "the Act makes provision for an award by the District Court of 'just compensation'" because this "undercuts even a colorable contention that the Government has punitively confiscated appellant's property"); Zilich v. Longo, 34 F.3d 359, 362 (6th Cir. 1994) (rejecting bill of attainder claim where "[t]he "ordinance does not purport to confiscate or take title to any of Zilich's property").

Next, as discussed above in relation to the substantive due process claim, the Charter Amendment's elimination of Powell Crossing's ability to build high-density housing on its land can be said to further legitimate nonpunitive interests in public safety and reducing traffic congestion. Cf. Gardner v. City of Columbus, Ohio, 841 F.2d 1272, 1278 (6th Cir. 1988) (holding that assessment of civil penalties for motor vehicle parking offenses did not constitute punishment). The Charter Amendment moderates the burden imposed upon Powell Crossing by leaving it able develop its land for all other permissible residential and non-residential uses.

Finally, Powell Crossing has not met its burden of presenting "unmistakable evidence of punitive intent."  Selective Serv., 468 U.S. at 855 n. 15 (internal quotation marks omitted).  The particular difficulty is divining the intent of the voters who approved the Charter Amendment.  In Club Misty the court opined, without deciding, that the revocation of liquor licenses was not a bill of attainder because "we have no information about the purpose that actuated the petitions and the votes against these licensees; nor is the revocation of a license a characteristically punitive sanction." 208 F.3d at 617.  So too here the court is without information to determine the motives, among myriad possibilities, that caused Powell voters to approve the Charter Amendment – other than the

Amendment's facial prohibition of high-density housing – and to determine if those motives evince an intent to punish.[14]

Thus, the court finds as a matter of law that the Charter Amendment is not a bill of attainder.

## VII. Equal Protection

The Equal Protection Clause provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The Clause protects similarly situated individuals against disparate treatment through government action that "either burdens a fundamental right, targets a suspect class, or has no rational basis." Center for Bio–Ethical Reform, Inc. v. Napolitano, 648 F.3d 365, 379 (6th Cir. 2011) (internal quotation marks omitted). Powell Crossing's claim, which does not concern a fundamental right or suspect class, is based on a "class-of-one" theory. To prevail on this type of claim, a plaintiff must establish "disparate treatment from similarly situated individuals and that the government actors had no rational basis for the difference, Assoc. of Cleveland Fire Fighters v. City of Cleveland, Ohio, 502 F.3d 545, 549 (6th Cir. 2007), or that the 'challenged government action was motivated by animus or ill-will,' EJS Props., LLC v. City of Toledo, 698 F.3d 845, 864 (6th Cir. 2012)." Paterek, 801 F.3d at 650.

A similarly situated individual or business is one that is similar "'in all relevant respects.'" Paterek, 801 F.3d at 650 (quoting United States v. Green, 654 F.3d 637, 651 (6th Cir. 2011)). In determining whether parties are similarly situated, "courts should not demand exact correlation, but should instead seek relevant similarity." Perry v. McGinnis, 209 F.3d 597, 601 (6th Cir. 2000).

Powell Crossing contends that it is similarly situated to a developer known as Liberty Green. Liberty Green received approval from City Council on October 7, 2014 for a mixed-use

---

[14] The recitation of facts in the complaint alleges that one resident spoke at a City Council meeting in August 19, 2014 and expressed opposition to apartments being built because it would lead to gangs, drug-dealing and a deterioration of the community. Compl., ¶ 63. The complaint also alleges that a proponent of Petitioners' ballot measures stated on a social media posting that building apartments would enable lower-income families to move to Powell and thereby threaten home values. See id, ¶ 65.

These "isolated statements" do not suffice to establish the intent of the majority of voters. BellSouth Corp. v. F.C.C., 162 F.3d 678, 690 (D.C. Cir. 1998). Moreover, the statements do not evince a punitive intent directed at Powell Crossing but rather a general opposition to building apartments and its perceived side-effects.

development in the Downtown Business District.  Liberty Green's plan was for the construction of a commercial building and eleven double-unit, owner-occupied condominiums on 3.7 acres at 110 South Liberty Street.  See Compl., Ex. N; Aff. of David M. Betz, City of Powell Director of Development, ¶ 6.  Powell Crossing argues that it received disparate treatment in that the Charter Amendment revoked its development plan while Liberty Green's plan was not similarly revoked.

The court finds it unlikely that Powell Crossing and Liberty Green are similarly situated in all relevant respects.  To be sure, Powell Crossing and Liberty Green are both land developers who received approval from City Council within a four-month timespan in 2014 to build mixed-use projects, including multi-family dwellings, in the Downtown Business District.  Thus, this case is distinguishable from others in which plaintiff landowners wholly failed to identify specific examples of a similarly situated landowner.  See Braun, 519 F.3d at 575; Silver v. Franklin Twp. Bd. of Zoning Appeals, 966 F.2d 1031, 1036-37 (6th Cir. 1992).  It is also distinguishable from cases in which the passage of time significantly separated an applicant from prior zoning applicants.  See EJS Props., 698 F.3d at 865-66 (citing Purze v. Vill. of Winthrop Harbor, 286 F.3d 452, 454-55 (7th Cir. 2002)).

But it cannot be overlooked that City Council did not treat Powell Crossing differently from Liberty Green; voters were the ones who approved passage of the Charter Amendment.  The actions Powell Crossing attempts to compare as disparate (the Charter Amendment and City Council's approval of Liberty Green's plan) came from different decisionmakers.[15]  This casts substantial doubt on Liberty Green being a suitable comparator.  See, e.g., United States v. Moore, 543 F.3d 891, 897 (7th Cir. 2008) (in addressing a class-of-one challenge to a criminal sentence, holding that "the separate federal and state prosecutions necessarily involved at least two decision-makers, one federal and one state; this alone works against a finding of similarity"); Purze, 286 F.3d at 455 (finding that class-of-one plaintiffs were not similarly situated to comparators in part because different decisionmakers acted upon their zoning requests); Washington v. City of Georgetown, No. CIV.A. 08-402-KSF, 2010 WL 3892002 at *10 (E.D. Ky. Sept. 29, 2010) (rejecting equal protection claim where plaintiff failed to contradict evidence that different decisionmakers were involved).[16]  It

---

[15]  Petitioners press the matter one step further, arguing that Powell Crossing suffered no disparate treatment because the Charter Amendment should be interpreted as likewise prohibiting Liberty Green from going forward with its development plan.  The court declines to address this argument, as Liberty Green's legal rights are not properly at issue in this case.

[16]  In determining whether employees are similarly situated in Title VII cases, the Sixth Circuit looks to whether the employees at issue "dealt with the same ultimate supervisor" or decisionmaker, McMillan v. Castro, 405 F.3d 405, 414 (6th Cir. 2005), or were at least subject to the same policies or

is impossible on the current record for Powell Crossing to dispel that doubt by demonstrating that these two decisionmakers applied or should have applied the same policies or standards in making their decisions.  Voters were free to vote for the Charter Amendment for any reason, while City Council members, though not legally bound to do so, followed the criteria set forth in the City's zoning code.  See Compl., Ex. D at 13-14.

Even if Powell Crossing and Liberty Green were similarly situated, the court finds that Powell Crossing has not demonstrated that the alleged disparate treatment lacked a rational basis.  In the Sixth Circuit, "[a] 'class of one' plaintiff may demonstrate that a government action lacks a rational basis in one of two ways: either by negativing every conceivable basis which might support the government action or by demonstrating that the challenged government action was motivated by animus or ill-will." Warren, 411 F.3d at 711 (internal quotation marks and alteration omitted).  Thus, "courts will not overturn government action 'unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that [the court] can only conclude that the [government's] actions were irrational.'" Id. at 710-11 (quoting Kimel v. Fla. Bd. of Regents, 528 U.S. 62, 84 (2000)).

In the context of zoning and land development, a court may compare the scale and impact of the plans of purportedly similarly situated landowners.  See Braun, 519 F.3d at 575; Ziss Bros. Constr. Co. v. City of Indep., Ohio, 439 Fed. App'x 467, 476-78 (6th Cir. 2011).  As the City points out, Powell Crossing's development plan of 64 apartment units is much greater in number than Liberty Green's plan of 22 condominiums.  Powell Crossing's apartments would have 150 surface parking spaces, while Liberty Green's condominiums would have much fewer.  See Compl, Ex. C at PAGEID#304 (indicating 150 surface spaces and 36 garage spaces for Powell Crossing) and Ex. N at PAGEID#414 and #420 (indicating garage space for each unit at Liberty Green but no specifically marked surface spaces, though paved area near each unit suggests the availability of limited surface parking).

As the court discussed in relation to the substantive due process claim, the record supports a finding that Powell Crossing's development would "add an access point and additional drivers to an already maxed out roadway," Compl., Ex. C at PAGEID #289, and push Olentangy Street past a "tipping point" id., Ex. D at PAGEID #353.  See 37712, Inc., 113 F.3d at 622 (noting that the

standards, see Seay v. Tenn. Valley Auth., 339 F.3d 454, 479-80 (6th Cir. 2003).  See also Harvey v. Anheuser-Busch, Inc., 38 F.3d 968, 972 (8th Cir. 1994) ("When different decision-makers are involved, two decisions are rarely 'similarly situated in all relevant respects.'").

rationality inquiries of substantive due process and equal protection law are "analogous"). Further, several public officials expressed safety concerns stemming from the site's close proximity to a railroad crossing on Olentangy Street.  See Compl., Ex. C at PAGEID #289, and Ex. D at PAGEID #355.  Powell Crossing's location on Olentangy Street and adjacent to a railroad line makes these traffic and safety concerns particularized for the Powell Crossing site; that is, Powell Crossing has put forth no evidence to support an inference that such concerns accompany the Liberty Green site, which is located on a different roadway and not next to a railroad crossing.  See Ziss Bros., 439 Fed. App'x at 476 ("[A] plaintiff bears the entirety of the burden in demonstrating that the challenged action had no rational basis . . . .").  These distinguishing aspects of the Powell Crossing site, when combined with the development's much greater number of multi-family units and parking spaces, readily provides a rational basis for the voters' disparate treatment of Powell Crossing and Liberty Green.  See FCC v. Beach Commc'ns, Inc., 508 U.S. 307, 313 (1993) (holding that equal protection is not violated "if there is any reasonably conceivable state of facts that could provide a rational basis" for the disparate treatment); 37712, Inc., 113 F.3d at 622-23 (holding that "federal courts must accord great deference" to "sensible" distinctions drawn in social and economic legislation); Purze, 286 F.3d at 455 (holding that differences in the topography of two plats, including the presence of a ravine in one plat, justified the village board's differing treatment of development plans).

Powell Crossing argues that traffic concerns cannot be used to justify disparate treatment because the City, under state law, must approve an otherwise lawful development plan if traffic considerations are the only objection.  See State ex rel. Killeen Realty Co. v. City of E. Cleveland, 169 Ohio St. 375, 386, 160 N.E.2d 1, 8 (Ohio 1959) (finding that "traffic regulation must remain a byproduct of zoning activities").  Powell Crossing's characterization of state law appears to oversimplify the matter, as one court clarified: "we do not hold that traffic concerns could not have been considered as part of the review process. . . .  However, evidence that a proposed facility will generate increased traffic is insufficient, standing alone, to justify the denial of an otherwise permitted use by a property owner."  Elbert v. Bexley Planning Comm'n, 108 Ohio App.3d 59, 76, 670 N.E.2d 245, 256 (Ohio Ct. App. 1995).  The evidence here is of more than increased traffic – it is of increased traffic on a road that is already at capacity and near a railroad crossing.  See Davis v. Coventry Twp. Bd. of Zoning Appeals, No. 20085, 2001 WL 123464 at *4 (Ohio Ct. App. Feb. 14, 2001) (distinguishing Killeen Realty because "the Board's apparent concern is not with increased

45

traffic . . . [but] that the location of the lot makes it so inherently dangerous a location to build that no variance should be issued").

Moreover, City Council did in fact approve Powell Crossing's plan.  Again, a different decisionmaker rejected Powell Crossing's plan.  Though state law may limit the discretion of local authorities to consider increased traffic as a determinative factor in reviewing zoning and development applications, federal rational basis case law does not so restrain local authorities, much less the electorate.  See Shoemaker v. City of Howell, 795 F.3d 553, 567 (6th Cir. 2015) (listing Supreme Court and Sixth Circuit cases recognizing that traffic, public safety, property values and aesthetics are legitimate governmental interests); cf. Schuette, __ U.S. at __, 134 S.Ct. at 1637 ("It is demeaning to the democratic process to presume that the voters are not capable of deciding an issue of [ ] sensitivity on decent and rational grounds.").

Powell Crossing's remaining avenue of proving its class-of-one theory is to demonstrate that voters were motivated by animus or ill-will.  It has not carried this burden.  Powell Crossing argues that proof of animus can be found in the determination of the Delaware County Board of Elections that the ballot petition for the Charter Amendment contained a title and text that was "misleading" because it failed "to convey the full and complete nature and effect of the Petition."  Compl., Ex. L at Resolution ¶ 3.  But the Board did not further explain its determination, and it made no findings as to the Petitioners' intent or state of mind.  The Board found that the written form of the petition was misleading, not that the Petitioners had acted with intent to mislead or with any ill-will.  More importantly, the state of mind of the three Petitioners cannot be imputed to the majority of voters who approved the Charter Amendment.  On its face the Charter Amendment indicates that the electorate acted to oppose the high-density housing aspect of Powell Crossing's plan and not with animus toward Powell Crossing itself.  See Ziss Bros., 439 Fed. App'x at 479 (rejecting equal protection claim where "Plaintiff does not allege any personal, or class of one based animus on the part of the Defendants.  Rather, Plaintiff alleges that Defendants' animus was directed towards the Preliminary Plan.").

Thus, the court thus finds that the equal protection claim fails as a matter of law.

## VIII.   Severability

The court has concluded that the Charter Amendment contains an unlawful delegation of legislative authority to private citizens.  Petitioners argue that if any portion of the Charter

Amendment is found to be unconstitutional, the offending language should be severed and the remainder of the Amendment saved.

"Severability of a local ordinance is a question of state law . . . ." City of Lakewood v. Plain Dealer Publ'g Co., 486 U.S. 750, 772 (1988).  In accord with the rule for state statutes, see O.R.C. § 1.50, the Powell Charter provides for the presumptive severability of invalid provisions.  See Powell City Charter, Art. XII, § 12.02.  The primary inquiry under Ohio law is whether severance will "fundamentally disrupt the statutory scheme of which the unconstitutional provision is a part." State v. Hochhausler, 76 Ohio St.3d 455, 464, 668 N.E.2d 457, 466 (Ohio 1996).  In making that inquiry, courts may consider whether: (1) the constitutional and the unconstitutional provisions are "capable of separation so that each may be read and may stand by itself," (2) the unconstitutional portion is "so connected with the general scope of the whole as to make it impossible to give effect to the apparent intention of the Legislature if the clause or part is stricken out" and (3) "the insertion of words or terms" is necessary "to separate the constitutional part from the unconstitutional part, and to give effect to the former only." Id., 76 Ohio St.3d at 464-65, 668 N.E.2d at 466–67 (internal quotation marks omitted).

An issue the court will leave unresolved, as the parties and Petitioners do not raise it, is whether the Powell Charter's standard for severability varies from the standard for state statutes. The Charter provides that invalid parts do not impair other parts "except to the extent that such other part is wholly dependent for its operation upon the part declared invalid."  Powell City Charter, Art. XII, § 12.02.  The "wholly dependent" standard arguably differs from the Ohio Supreme Court's "fundamental disruption of the statutory scheme" standard.  Even so, the Ohio Supreme Court applies the "fundamental disruption" standard for state and municipal legislation alike.  See State ex rel. Sunset Estate Props., L.L.C. v. Lodi, 142 Ohio St.3d 351, 356, 30 N.E.3d 934, 939 (Ohio 2015).  And courts use phrases like "essentially connected," "wholly dependent" and "inseparably involved" to drive at the same underlying focus on whether the byproduct of severance would reflect or give effect to the intent of the act.  See Hochhausler, 76 Ohio St.3d at 465, 668 N.E.2d at 467 (using the term "essentially connected"); In re Estate of Sauers, 32 A.3d 1241, 1257 n.9 (Pa. 2011) (using the terms "essentially and inseparably connected" and "wholly dependent" as having the same or similar meaning); see also C.J.S. Statutes § 119 (equating "wholly dependent" with "inseparably involved").  Furthermore, this court's power to sever language from the Charter Amendment is constrained by concerns of separation of powers and federalism.  No matter how far a law's severability provision law invites a court to go in salvaging lawful portions, a court should not

invade the "legislative domain" by engaging in the "quintessentially legislative work" of writing or rewriting laws.  Ayotte v. Planned Parenthood of N. New Eng., 546 U.S. 320, 329-30 (2006) (stating that "we are wary of legislatures who would rely on our intervention"); Eubanks v. Wilkinson, 937 F.2d 1118, 1125 (6th Cir. 1991) ("'The principles of federalism forbid a federal appellate court to arrogate the power to rewrite a municipal ordinance.'") (quoting Hill v. City of Houston, 789 F.2d 1103, 1112 (5th Cir. 1986)).

In arguing in favor of severability, Petitioners first argue that the court should simply delete the clause providing that City Council "make adjustments as necessary [and] consistent with the Phase I findings of [the] Comprehensive Plan Commission."  But this course of correction would only exacerbate the constitutional violation, because the end result would provide that "City Council shall consider the Preliminary Comprehensive Plan and pass an ordinance legislatively adopting it as a Final Comprehensive Plan."  The already unconstitutionally narrow allowance for City Council to make adjustments to the Plan would be eliminated altogether under Petitioners' proposed amendment.

Petitioners' next argument is for the court to "severe the entire citizen's commission and the Preliminary Comprehensive Plan."  Doc. 13-1 at 37.  Under this proposal, the court would rewrite the language of the Amendment to require City Council to draft and enact a Final Comprehensive Plan, with certain stated criteria as guideposts.  See Charter Am., Art. 4, § 19 (listing, among other criteria, balancing the "needs and desires" of Powell and balancing "residential and non-residential land use").  This solves one constitutional problem (the unlawful delegation of legislative authority) but creates another.  The Charter Amendment called for a citizen commission to do the work of creating a new comprehensive plan; City Council's role was largely reduced to rubber-stamping the commission's plan.  Petitioners' proposal would have this court reassign the work of drafting a new comprehensive plan to City Council.  Principles of separation of powers and federalism prevent the court from requiring a local legislative body to draft and enact particular legislation.  See, e.g., Philpot v. Patton, Ky., 837 S.W.2d 491, 494 (Ky. 1992) (noting that "it would be a violation of the separation of powers doctrine . . . for our Court to tell the General Assembly what to do, i.e., what system or rules to enact").

Moreover, Petitioners' second proposal would fundamentally disrupt the scheme approved of by voters.  The Charter Amendment reflects the voters' determination that a citizen commission, and not City Council, be the body entrusted with creating a new comprehensive plan.  The Charter Amendment left no room for City Council to make findings or gather public input.  Voters wished

for the commission's work to carry such force that City Council had to enact it as law and all city ordinances had to comply with it.  Thus, for the court to strike the commission from the process and insert or elevate City Council into its place would directly contradict the intent of voters.  See Eubanks, 937 F.2d at 1125 ("Courts do not want to be in the business of creating a program quite different from the one . . . actually adopted.") (internal quotation marks and alteration omitted); cf. Sunset Estate, 142 Ohio St.3d at 356, 30 N.E.3d at 939 (permitting severance if the act's "intended effect is not altered").

Petitioners lastly suggest amending the Charter Amendment so as to maintain a ban on high-density housing over the entire Downtown Business District.  Though the court agrees that voters intended for such a ban to be a component of the Final Comprehensive Plan, this proposal substantially departs from the stated purpose of the Charter Amendment of providing for a "wholesale revision" to the City's "comprehensive" plan.  It stands at odds with the title of the Charter Amendment, which voters would have had the opportunity to read when casting their votes: An Amendment "to substitute the comprehensive plan of the Village of Powell of December 1995 with a new comprehensive plan for zoning and development in the City of Powell, Ohio."  For the court to rewrite the Charter Amendment as a district-wide ban on high-density housing would also dispense with the process of fact-finding and balancing of criteria that voters wished to occur, and it would require the court to write the operative language of the ban from scratch because the term "Final Comprehensive Plan" is interspersed throughout the Charter Amendment.  Compare 10280 Northfield Rd., LLC v. Vill. of Northfield, No. 97-4207, 1999 WL 137622 at *5 (6th Cir. March 4, 1999) (declining to sever ordinance because striking "interspersed" elements would fundamentally disrupt the intended scheme) with Midwest Media Prop., L.L.C. v. Symmes Twp., Ohio, 503 F.3d 456, 464 (6th Cir. 2007) (severing language where "no words or terms need be added to separate the challenged portions from those not challenged").

It must be noted that there remains one potential approach which the Petitioners have not raised: severing the provisions relating to a new Final Comprehensive Plan and saving the portion effectively revoking Ordinance 2014-10.  The court finds that the Charter Amendment should be severed in this fashion.  The electorate made their intent clear: they did not want high-density housing allowed on the parcel owned by Powell Crossing.  The Charter Amendment represents the voters' decision that Ordinance 2014-10 is "not in the best interests of the people of the City of Powell" and that Powell Crossing's development plan had to be brought to a halt immediately.

Effectuating the electorate's intent as to Powell Crossing's property does not depend on whether the process of creating a new Final Comprehensive Plan goes forward or not.  Although voters wanted to both implement a new Final Comprehensive Plan and nullify Ordinance 2014-10, these goals are merely complimentary, not inseparably involved.  One goal concerns a long-term vision for the entire city; the other simply prevents apartments from being built on a particular parcel.

The language nullifying Ordinance 2014-10 appears in a discrete part of the Charter Amendment.  The Uncodified paragraph of the Amendment establishes a bar against Powell Crossing, and others, from taking action "in reliance upon Ordinance 2014-10 and the Final Development Plan."  The Charter Amendment forbids high-density housing, and the Uncodified paragraph applies that ban to Powell Crossing's property by stating that the property can be put to any "other uses" permissible under the zoning code.  For the court to save the Uncodified paragraph would require only that the term "non-high-density housing" be substituted for the word "other" so that the paragraph would read in part: "The subject property for the Ordinance 2014-10 Final Development Plan shall remain economically viable for non-high-density housing uses, including residential and non-residential uses."

Accordingly, the court finds that the Charter Amendment is capable of separation, such that the unlawful provisions relating to a new Final Comprehensive Plan can be severed without fundamentally disrupting the portion nullifying Ordinance 2014-10.

## IX.    State Constitutional Claim

Powell Crossing claims that the Charter Amendment is unconstitutional under Article II, Section 1f of the Ohio Constitution, which reserves the use of referendum and initiative powers by citizens of a municipality for questions on which a municipality is "authorized by law to control by legislative action."  Ohio Const., Art. II, § 1f.  Powell Crossing argues that the Charter Amendment effectively functioned as a referendum on Ordinance 2014-10 and that ordinances approving final development plans are administrative actions which are beyond the scope of the use of powers reserved in § 1f.  See Ebersole I, 140 Ohio St.3d at 491, 20 N.E.3d at 684.

The court has determined that the Charter Amendment contains a delegation of legislative authority which is unlawful under the United States Constitution and that the Charter Amendment is severable.  The remaining portion of the Charter Amendment is what the state constitutional claim puts squarely at issue.  A federal district court has the discretion to decline to exercise

supplemental jurisdiction over a state law claim that "raises a novel or complex issue of State law." 28 U.S.C. § 1367(c)(1).  The claim raised here is not so novel or complex as to warrant the court declining to exercise jurisdiction.

Ohio law plainly establishes that the reservation of power to the people of a municipality under § 1f creates a corollary rule: "an administrative action is beyond the scope of the referendum power."  Ebersole I, 140 Ohio St.3d at 491, 20 N.E.3d at 684 (citing Buckeye Cmty. Hope Found. v. City of Cuyahoga Falls, 82 Ohio St.3d 539, 544, 697 N.E.2d 181, 185 (Ohio 1998).  And the Ohio Supreme Court has already determined that Ordinance 2014-10, approving Powell Crossing's Final Development Plan, was an administrative action: "[C]ity ordinances that adopt final development plans pursuant to preexisting planned community development, without changing the zoning, are not subject to referendum. . . . Ordinance No. 2014–10, because it approves development within the contours of a preexisting zoning code, is not subject to referendum or initiative."  Id., 140 Ohio St.3d at 491-93, 20 N.E.3d at 684-85 (citing State ex rel. Comm. for the Referendum of Ordinance No. 3844–02 v. Norris, 99 Ohio St.3d 336, 792 N.E.2d 186 (Ohio 2003) (per curiam)).

It is equally clear that the citizens of Powell subjected Ordinance 2014-10 to the exercise of their initiative and referendum powers.  The parties do not dispute that the Charter Amendment began as an initiative petition to amend the Powell City Charter.  Compl., ¶ 49(c); Compl., Ex. L.; doc. 13-1 at 13.  While entitled "an initiative petition" (presumably because of the power being exercised to provide for the enactment of a new comprehensive plan), the Charter Amendment also contains provisions that function as a referendum.  That is, the Charter Amendment contains two exercises of power combined into one ballot measure – an initiative to provide for the creation of a new comprehensive plan and a referendum on Ordinance 2014-10.  Cf. Norris, 99 Ohio St.3d at 343, 792 N.E.2d at 193 (endorsing an approach to analyzing the "character" of an exercise of power by separating "the policy-making question of rezoning" from the "policy-effectuating approval of the final development plan" rather than "effectively lumping the two actions together") (internal quotation marks omitted).

A referendum refers "to the submission of legislative action to the voters."  State ex rel. Barberis v. City of Bay Vill., 31 Ohio Misc. 203, 205, 281 N.E.2d 209, 211 (Ohio Ct. Com. Pl. 1971) (citing Bouvier's Law Dictionary (Baldwin's Century ed., 1948); Black's Law Dictionary (Rev. 4th ed., 1968); Webster's Third New Int'l Dictionary (1961)).  Moreover, Section 9 of Article XVIII of the Ohio Constitution sets forth the process by which the people of a municipality may amend their charter – electors collecting a sufficient number of signed petitions, upon which the legislative

authority enacts an ordinance that is then submitted to the electors – and calls the process "a referendum vote."  Ohio Const., Art. XVIII, § 9; see also Black's Law Dictionary (10th ed. Ed. 2014) (defining a referendum as the process of referring a legislative act or constitutional amendment to the people for approval by popular vote).

The Charter Amendment does not use typical referendum language, but it did submit Ordinance 2014-10 to the voters.  Cf. Thrailkill v. Smith, 106 Ohio St.1, 6, 138 N.E. 532, 534 (Ohio 1922) (stating that in examining a ballot measure, a court should "pay less regard to [the] formalities . . . and [pay] greater regard to the substance").  As the Ohio Supreme Court determined, the Charter Amendment "would, among other things, nullify Ordinance No. 2014-10."  Ebersole I, 140 Ohio St.3d at 487, 20 N.E.3d at 680.  See also doc. 28 at 5 n.5 (Petitioners acknowledging that "the practical effect of the charter amendment [was] to nullify the Powell Crossing project").  The Charter Amendment, by its own words, is not compatible with Ordinance 2014-10 and provides that no action shall be taken "in reliance upon Ordinance 2014-10."  It forbids Powell Crossing from using the parcel for high-density housing.  As a referendum would, the proposed Charter Amendment presented voters with the opportunity to either affirm or revoke City Council's action.  A majority of the electorate voted to prevent Ordinance 2014-10 from having any binding legal effect.

Petitioners contend that § 1f does not apply because § 9 of Article XVIII of the Ohio Constitution exclusively governs amendments to city charters.  They argue that § 9, which contains no limitation on the types of actions that may be subject to charter amendment, trumps § 1f's limitation on the use of referendum power.  The Ohio Supreme Court rejected this type of argument in Buckeye Community, where it was argued that §§ 3 and 7 of Article XVIII (granting municipalities the power of self-government and the authority to frame, adopt or amend a charter for government) were not subject to the limitation of § 1f.  Voters had attempted to use the power purportedly granted to them under their city charter to reject a city council ordinance that administratively approved of a site plan.  The Supreme Court held that § 1f "is the sole constitutional source of initiative and referendum powers, reserved by the people of the state to the people of each municipality."  Buckeye Cmty., 82 Ohio St. 3d at 543, 697 N.E.2d at 184.  Section 1f "clearly limits referendum and initiative powers" and "[c]harter municipalities are subject to this limitation, as the powers of local self-government granted pursuant to Sections 3 and 7 of Article XVIII are subject to the limitations of other provisions of the Constitution."  Id., 82 Ohio St. 3d at 543, 697 N.E.2d at 184-85.

Petitioners are correct in observing that § 9 imposes no restraints on the scope of the use of charter amendments.  But this overlooks the purpose of that section, which is merely to "prescribe the applicable procedures" by which citizens of a charter municipality may amend their charter. State ex rel. Hackworth v. Hughes, 97 Ohio St. 3d 110, 114, 776 N.E.2d 1050, 1056 (Ohio 2002). Section 1f's limitation on the exercise of referendum power applies, no matter by what means citizens attempt to exercise that power.  Municipalities need not have charters, and it cannot be the case that citizens could circumvent § 1f's limitation by way of adoption of a charter or amendments to the charter: "[W]e hold that the citizens of a municipality may not exercise powers of referendum, by charter or other means, greater than those powers granted by Section 1f, Article II of the Ohio Constitution." Buckeye Cmty., 82 Ohio St.3d at 544, 697 N.E.2d at 185.  It follows that citizens of a municipality may not exercise the power of referendum, by means of a charter amendment, so as to nullify City Council's administrative action of approving Powell Crossing's development plan.

## X.     Conclusion

For the reasons stated above, the court finds as a matter of law that plaintiff Powell Crossing is entitled to permanent injunctive relief on its due process claim that the Charter Amendment contains an unlawful delegation of legislative power and on its state constitutional claim.  The court declares the Charter Amendment unconstitutional under the Due Process Clause of the Fourteenth Amendment and unconstitutional under Article II, Section 1f of the Ohio Constitution.  The court hereby invalidates the Charter Amendment in its entirety.

Defendant City of Powell is entitled to judgment as a matter of law as to the remainder of Powell Crossing's claims.

Powell Crossing shall advise the court within thirty days of the date of this order concerning its intention to seek damages and attorney's fees.

s/ James L. Graham
JAMES L. GRAHAM
United States District Judge

DATE: March 25, 2016